*698 Opinion
BAXTER, J.
This case presents issues arising under the establishment clause of the First Amendment to the United States Constitution,[1] and under article I, section 4[2] and article XVI, section 5 of the California Constitution. The question on which review was granted asks: Does a state law granting religiously affiliated organizations the authority to declare themselves exempt from historic preservation laws violate the establishment clause of the United States Constitution or any of the California Constitution religion clauses? The question arises in the context of a facial challenge to Government Code sections 25373 and 37361,[3] which have the effect of granting an exemption from landmark preservation laws to noncommercial property owned by a religious organization that objects to landmark designation and determines in a public forum that the organization would suffer a substantial hardship if the property were designated a historic landmark.
The Court of Appeal found no constitutional infirmity in the law. It concluded that the establishment clause found in article I, section 4 of the California Constitution did not afford broader protection than the First Amendment. It then held that the state may act to reduce an actual or perceived burden on the religious freedom of persons within its jurisdiction, particularly where the state has imposed that burden. The court reasoned that the exemption does not endorse religion. It simply facilitates the efforts of religious organizations to advance their own purposes. The ability of religious organizations to use their property to advance their purposes is no greater by virtue of the grant of an exemption than it was before the landmark preservation law was imposed on them. The law simply restores their ability to use noncommercial property, unencumbered by the restrictions that accompany landmark designation. Thus, the exemption does not provide governmental assistance to religious organizations in carrying out their religious mission. By providing the exemption the state simply stepped out of the way of the religious property owner.
The Court of Appeal also rejected plaintiffs’ claim that the exemption violated that part of the free exercise clause of article I, section 4 of the *699 California Constitution (article I, section 4) that guarantees free exercise without “preference.” The court reasoned that the dispute concerned only the establishment clause and that, in any event, the free exercise clause of article I, section 4 does not afford greater protection of religious freedom than does the First Amendment to the United States Constitution (First Amendment).
We agree. We conclude that sections 25373 and 37361 are not facially invalid under the establishment clause of article I, section 4 or the First Amendment. We also conclude that the exemption created by those provisions does not violate the no-preference provision of article I, section 4, or article XVI, section 5 of the California Constitution (article XVI, section 5).
We shall, therefore, affirm the judgment of the Court of Appeal.
I

Background.

Plaintiffs, one secular nonprofit community economic development organization that owns properties designated as or eligible for designation as landmark sites, several nonprofit organizations interested in the preservation of historic landmarks in California, and the City and County of San Francisco, initiated this action seeking injunctive and declaratory relief on the ground that sections 25373 and 37361 are facially invalid to the extent that these laws grant noncommercial property owned by religious organizations an exemption from historic landmark designation and regulation. The trial court agreed and granted summary judgment in favor of plaintiffs, declaring that the law violated both the state and the federal establishment clauses and was an unconstitutional delegation of governmental power to private entities. The court therefore enjoined enforcement of the exemption provisions. The Court of Appeal reversed.
The Court of Appeal reasoned that if the landmark preservation law significantly interfered with the ability of religious organizations to freely exercise their religion, the exemption might be constitutionally permissible to alleviate the burden of that interference. (Corporation of Presiding Bishop v. Amos (1987) 483 U.S. 327, 335 [107 S.Ct. 2862, 2868, 97 L.Ed.2d 273].) It concluded, however, that it did not have to decide if a significant interference resulted from application of the landmark preservation law, reasoning that even if it determined that there was no burden on the free exercise of religion, the issue would not be resolved since the “limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.” (Walz v. Tax Commission (1970) 397 U.S. 664, 673 [90 S.Ct. 1409, 1413-1414, 25 L.Ed.2d *700 697] (Walz); see also Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 334 [107 S.Ct. at p. 2867].) After reviewing recent First Amendment decisions of the United States Supreme Court, which it believed were not controlling, the Court of Appeal concluded that actual interference with free exercise was not a constitutional prerequisite to a valid legislatively created exemption to accommodate religion. Relying in part on Rowe v. Superior Court (1993) 15 Cal.App.4th 1711, 1731-1732 [19 Cal.Rptr.2d 625], it held that the Legislature may act to alleviate a burden that rationally can be perceived as posing a significant deterrent to the free exercise of religion, and that “given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim.” The court acknowledged that its conclusion differed from the conclusion reached in Duffy v. State Personnel Bd. (1991) 232 Cal.App.3d 1, 12 [283 Cal.Rptr. 622], where the court had held that before governmental action may be perceived as a permissible accommodation of religion, the action must lift an identifiable burden on free exercise.
The Court of Appeal held that the no-preference provision of the California free exercise clause did not create a standard that is more protective than the First Amendment establishment clause. It also rejected plaintiffs’ article XVI, section 5 argument.
This court granted plaintiffs’ petition for review to consider whether the exemption violates the establishment clause of either the federal or state Constitution or any other clause of the state Constitution related to religion.[4]
II

Questions to Be Addressed.

Plaintiffs’ challenge to the validity of the exemption provisions of sections 25373 and 37361 is based primarily on an argument that permitting religious *701 entities to exempt their noncommercial properties from landmark preservation laws violates the establishment clauses of the First Amendment and both the free exercise/no preference and the establishment clauses of article I, section 4.
The State of California, defending the constitutional validity of the statutes, contends that the exemption does not violate the free exercise/no preference clause of article I, section 4. The exemption is necessary because landmark status imposes a substantial burden on religious entities’ free exercise of religion. And, in any event, the exemption is permissible because the Legislature could reasonably believe that historical landmark status would burden free exercise of religion by religious entities owning such properties. Therefore, the state argues, a legislative decision to grant an accommodating exemption does not violate either the state or federal establishment clause or the state free exercise/no preference clause.
Before addressing the questions thus posed, we outline the state law that gives rise to this case, and, to put the arguments in context, the provisions of a typical landmark preservation ordinance.
A. The State Landmark Preservation Enabling Legislation.
Section 25373, enacted in 1963 (Stats. 1963, ch. 987, § 1, p. 2249) and section 37361, first enacted in 1957 (Stats. 1957, ch. 864, § 1, p. 2078) and amended in 1959 (Stats. 1959, ch. 2015, § 1, p. 4655) apply to county and city government, respectively. Each grants authority to acquire historic landmarks for the purpose of preserving and/or developing the property. Each also grants authority to “provide special conditions or regulations for the protection, enhancement, perpetuation, or use of places, sites, building, structures, works of art, and other objects having a special character or special historical or aesthetic interest or value.” (§ 25373; see § 37361 [substantially similar].) These special conditions and regulations may include appropriate and reasonable control of the appearance of neighboring private property within public view. (§§ 25373, subd. (b), 37361, subd. (b).) The State Office of Historic Preservation advises that as of 1994, when a preservation survey was conducted, of the 356 jurisdictions that responded, 15 counties had enacted landmark preservation ordinances, the first of which were those enacted by Sacramento and Ventura Counties in 1966. One hundred twenty-two cities had enacted such ordinances, 17 of which were enacted in 1960.
The exemption at issue here, found in subdivision (d) of section 25373, and subdivision (c) of section 37361, was added as a temporary measure in *702 1993 (Stats. 1993, ch. 419, §§ 1, 2, pp. 2378-2379.) It was made permanent in 1994 with the passage of Assembly Bill No. 133 (1993-1994 Reg. Sess.). (Stats. 1994, ch. 1199, §§ 1, 2.)
Sections 25373 and 37361 provide in pertinent part: “Subdivision (b) shall not apply to noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur:
“(1) The association or corporation objects to the application of the subdivision to its property.
“(2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved.” (§§ 25373, subd. (d), 37361, subd. (c).)
An explanation of the purpose of the exemption subdivisions was included in Senate Bill No. 1185 (1993-1994 Reg. Sess.), the 1993 legislation, and in Assembly Bill No. 133 (1993-1994 Reg. Sess.), the 1994 bill (hereafter Assembly Bill No. 133), each of which, after noting that historic landmark restrictions were not related to or compelled by public health or safety concerns, stated: “Sections 1 and 2 of this act ensure the protection of religious freedom guaranteed by Section 4 of Article I of the California Constitution and by the First Amendment to the United States Constitution.” (Stats. 1993, ch. 419, § 7, p. 2388; see Stats. 1994, ch. 1199, § 3 [substantially identical].)
These Government Code provisions, as is apparent, do not themselves exempt any property from any landmark preservation ordinance. Instead, they prohibit application of any local landmark preservation law to property owned by a religious entity that satisfies the statutory criteria through which the owner may exempt its noncommercial property. Since the purpose and effect of the law is to create an exemption, however, we refer to and analyze these provisions as exemptions.
B. Local Landmark Preservation Laws.
The burden or perceived burden that the designation of noncommercial property owned by a religious organization as a landmark imposes on the owner’s free exercise of religion cannot be assessed in a vacuum. In this *703 facial attack on sections 25373 and 37361, we have no evidence of the actual impact of any landmark preservation ordinance as applied to any property. However, plaintiffs’ complaint alleged that article 10 of the San Francisco Planning Code, enacted in 1967, is a representative example of local landmark preservation legislation and has been made part of the record in this matter. The state did not dispute that characterization of the ordinance. We shall, therefore, assume that the San Francisco Planning Code is typical and look to it in assessing whether the restrictions imposed by typical local landmark preservation legislation on their face either imposed a burden or, if the Court of Appeal was correct in its enunciation of the test, reasonably may be perceived as imposing a burden on free exercise of religion.
Under section 1004, subdivision (a) of the San Francisco Planning Code, after specified procedural requirements have been complied with, which include a hearing at which the owner may appear, the board of supervisors, by ordinance, may “designate an individual structure or other feature or an integrated group of structures and features on a single lot or site, having a special character or special historical, architectural or aesthetic interest or value, as a landmark . . . .” Under that section the board may also “designate an area containing a number of structures having a special character or special historical, architectural or aesthetic interest or value, and constituting a distinct section of the city, as a historic district.” (Ibid.)
Section 1005, subdivision (a) of the San Francisco Planning Code provides: “No person shall carry out or cause to be carried out on a designated landmark site or in a designated historic district any construction, alteration, removal or demolition of a structure or any work involving a sign, awning, marquee, canopy, mural, or other appendage, for which a City permit is required, except in conformity with the provisions of this Article 10.” No permits are to be issued except in conformity with the ordinance, and, in a historic district, “any or all exterior changes visible from a public street or other public place shall require approval in accordance with the provisions of this Article 10, regardless of whether or not a City permit is required for such exterior changes. Such exterior changes may include, but shall not be limited to, painting and repainting; landscaping; fencing; and installation of lighting fixtures and other building appendages.” (Id., subd. (c)(1).) Unless the proposed work is for ordinary maintenance and repair to correct deterioration, decay, or damage, a “Certificate of Appropriateness” is required for exterior changes, construction, alteration, removal or demolition, and for exterior work of the type described in a historic district. (Id., § 1006.)
If the city planning commission concludes that a proposed structural alteration or exterior change “would have a significant impact upon, or is *704 potentially detrimental to, the landmark site or historical district, or upon request of the Planning Commission, the Planning Commission shall hold a public hearing on the application.” (S.F. Planning Code, § 1006.2, subd. (a)(2).) If the proposed work involves construction or alteration of a landmark, or involves an “appendage” (sign, awning, etc.) or exterior change in a historic district, the commission must approve or disapprove the application in whole or in part. (Id., § 1006.6, subd. (a).) In deciding whether to grant a certificate of appropriateness, the reviewing agencies must consider “architectural style, design, arrangement, texture, materials, color, and any other pertinent factors.” (Id., § 1006.7.) If the application is for a landmark site, “the proposed work shall preserve, enhance or restore, and shall not damage or destroy, the exterior architectural features of the landmark .... The proposed work shall not adversely affect the special character or special historical, architectural or aesthetic interest or value of the landmark and its site, as viewed both in themselves and in their setting, nor of the historic district in applicable cases.” (Id., § 1006.7, subd. (b).) Misdemeanor penalties of a fine not exceeding $500 and/or imprisonment up to six months is provided for violations of the ordinance, with a new offense committed for each day a violation is committed or permitted to continue. (Id., § 1013, subd. (d).)
If removal or demolition of a structure is proposed, the commission may suspend action on an application for six months, and, for good cause shown, the board of supervisors may extend that suspension for an additional six months. (S.F. Planning Code, § Í006.6, subd. (b).) Thus, the landmark controls may preclude an otherwise permissible removal or destruction of a structure for up to one year. During that period the planning commission is authorized to take steps necessary to preserve the structure and may seek public or private purchase of the structure or removal to another site. (Id., § 1006.6, subd. (d).)
Additional provisions govern the granting of a certificate of appropriateness for structures within several areas of San Francisco that have been designated as historic districts. (See S.F. Planning Code, §§ 1006.2-1006.6; see also id., art 10, appens. B-K.)
Ill

Does the Exemption from Landmark Restrictions Violate Either the First Amendment or Article I, Section 4?

A. First Amendment Establishment Clause.
Plaintiffs contend that sections 25373 and 37361 violate the establishment clause of the First Amendment by conferring a benefit on religious *705 organizations that is not extended to nonreligious entities that own noncommercial property that has been designated a landmark. The Supreme Court has repeatedly recognized, however, that “not every law that confers an ‘indirect,’ ‘remote,’ or ‘incidental’ benefit upon religious institutions is, for that reason alone, constitutionally invalid. [Citations.] What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been ‘sponsorship, financial support, and active involvement of the sovereign in religious activity.’ Walz v. Tax Comm’n, supra, at 668 [90 S.Ct. at p. 1411]; Lemon v. Kurtzman [(1971) 403 U.S. 602,] 612 [91 S.Ct. 2105, 2111, 29 L.Ed.2d 745].” (Committee for Public Education v. Nyquist (1973) 413 U.S. 756, 771-772 [93 S.Ct. 2955, 2965, 37 L.Ed.2d 948].)
In Walz, supra, 397 U.S. at page 669 [90 S.Ct. at pages 1411-1412], the court had elaborated on the nature of those evils and the difficulty the court has experienced in developing the jurisprudence of the establishment and free exercise clauses:
“The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purposes of those provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either govemmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.
“Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses had prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.” (Walz, supra, 397 U.S. at pp. 669-670 [90 S.Ct. at pp. 1411-1412].)
Building on Walz and earlier cases, in Lemon v. Kurtzman, supra, 403 U.S. 602 (Lemon), the court developed an analytical framework under which a statute challenged under the establishment clause should be examined to assess whether the conduct is constitutionally forbidden. “Every *706 analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must.have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 [88 S.Ct. 1923, 1929, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster ‘an excessive government entanglement with religion.’ Walz, supra, at 674 [90 S.Ct. at p. 1414].” (Lemon, supra, 403 U.S. at pp. 612-613 [91 S.Ct. at p. 2111].) Collectively, these are the three prongs of the “Lemon test.”
Although, as the Court of Appeal noted here, the Lemon test, which derives in part from Walz, is ill-suited to evaluating an establishment clause challenge to a law that creates an exemption for religious bodies from a neutral' law of general application, the high court has not yet modified the test to accommodate such exemptions. In Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327, the Supreme Court applied the Lemon test and, concluding that the law challenged there satisfied that test, found it unnecessary to decide if a different standard should apply when a religious exemption was challenged under the establishment clause. The question there was whether an exemption of a religious organization’s secular, nonprofit activities from title VII of the Civil Rights Act of 1964’s prohibition of employment discrimination on the basis of religion (42 U.S.C. § 2000e et seq.) violated the establishment clause of the First Amendment. The Supreme Court examined the impact on religious exercise both of the law from which exemption was authorized and, applying the Lemon test, of the exemption itself. (42 U.S.C. § 2000e-l(a).) Before doing so, the court set out the establishment clause principles under which the validity of the exemption was to be determined: “ ‘This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.’ Hobbie v. Unemployment Appeals Comm’n of Fla., 480 U.S. 136, 144-145 [107 S.Ct. 1046, 1051, 94 L.Ed.2d 190] (1987) (footnote omitted). It is well established, too, that ‘[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.’ Walz v. Tax Comm’n, 397 U.S. 664, 673[, supra,] [90 S.Ct. 1409, 1413-1414], There is ample room under the Establishment Clause for ‘benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.’ Id., at 669 [90 S.Ct. at p. 1412], At some point, accommodation may devolve into ‘an unlawful fostering of religion.’ Hobbie, supra, at 145 [107 S.Ct. at p. 1051], but these are not such cases, in our view.” {Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at pp. 334-335 [107 S.Ct. at pp. 2868-2869].)
*707 The court then applied the Lemon test to the exemption and, in doing so, considered the impact of the exemption from the nondiscrimination provision of title VII. The first prong of that test, that the law have a secular purpose, was met even though the exemption benefited only religious organizations. The court explained that having a secular purpose does not require that the purpose of the challenged law be unrelated to religion. The secular purpose test is aimed at preserving governmental neutrality in religious matters. “Under the Lemon analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions.” (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 335 [107 S.Ct. at p. 2868].) The court next examined the impact of the law to which the exemption applied and concluded that, notwithstanding a prior limited exclusion for religious activities, the title VII ban on discrimination continued to impose a significant burden on religious organizations by requiring them to predict, on pain of serious sanctions if they were wrong, which of their activities a court would deem to be religious. (483 U.S. at pp. 335-336 [107 S.Ct. at p. 2868].)
Addressing the second prong of the Lemon test—that the law have a “principal or primary effect. . . that neither advances nor inhibits religion” {Lemon, supra, 403 U.S. at p. 612 [91 S.Ct. at p. 2111])—the court pointed out that a law that permits a church to advance religion is not unconstitutional. Only if the government promotes religion through its own activities or influence is there a forbidden effect. The record did not suggest that the exemption gave the church any greater ability to propagate its religious message that it had before it was subjected to the nondiscrimination in hiring provisions of title VII. Therefore the government did not, by enacting the exemption, itself advance religion. The benefit religious institutions gained, as against other employers subject to title VII, was not a basis for invalidating the exemption. “Where . . . government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities.” {Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 338 [107 S.Ct. at p. 2869].)
The court subsequently struck down a state religious exemption from a generally applicable sales tax on periodicals in Texas Monthly, Inc. v. Bullock (1989) 489 U.S. 1, 18 [109 S.Ct. 890, 901, 103 L.Ed.2d 1], holding that the tax exemption violated the establishment clause of the First Amendment because there was no actual burden on free exercise rights and no “concrete need” to accommodate religious activity. There, however, the plurality *708 opinion of Justice Brennan emphasized that the tax exemption had the effect of subsidizing the religious body in the distribution of its religious message. “[W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion ... it ‘provide[s] unjustifiable awards of assistance to religious organizations’ and cannot but ' conve [y] a message of endorsement’ to slighted members of the community. [Citation.] This is particularly true where . . . the subsidy is targeted at writings that promulgate the teachings of religious faiths.” (489 U.S. at p. 15 [109 S.Ct. at p. 900], fn. and italics omitted.) Justice Blackmun, in whose opinion Justice O’Connor joined, also emphasized that the exemption constituted “preferential support for the communication of religious messages.” (Id. at p. 28 [109 S.Ct. at p. 907] (cone. opn. of Blackmun, J.).) Moreover, freedom of the press considerations not present here led Justices Blackmun, O’Connor, and White to concur in the judgment. Thus, in Texas Monthly there was no clear majority holding that the tax exemption, without more, violated the establishment clause.
We agree with the Court of Appeal that the Lemon test is ill-suited to assessing accommodating religious exemptions from neutral, generally applicable laws. Nonetheless, in the absence of further guidance from the Supreme Court as to the means by which the validity of such exemptions should be assessed, we will apply it here, assuming that we may uphold the exemption if the Legislature has a reasonable basis for concluding that landmark designation of noncommercial property owned by a religious entity may impose a significant burden on the ability of the owner to disseminate its message. (See Rowe v. Superior Court, supra, 15 Cal.App.4th at pp. 1731-1732 [“Under well-established principles of establishment clause analysis, the government can legitimately relieve religious institutions of [a burden that] . . . can rationally be seen as posing a significant deterrent to the free exercise of religion.” (Fn. omitted.)].)
And, of course, to protect against the evils the Lemon test seeks to identify and avoid, the court must ask whether providing an exemption from a historic landmark preservation law for noncommercial property owned by religious entities contributes to government sponsorship, financial support, or active involvement of the government in religious activity.
In our establishment clause analysis we also emphasize that this facial attack on the exemption created by sections 25373 and 37361 does not claim that exemption from landmark preservation laws broadly impinges upon an *709 individual’s exercise of a fundamental constitutional right or that in its general and ordinary application it does so. (Cf. American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 347 [66 Cal.Rptr.2d 210, 940 P.2d 797].) (4) Therefore we apply the well-established rule that a statute will not be deemed facially invalid on constitutional grounds unless its provisions present a “ ‘total and fatal conflict with applicable constitutional prohibitions,’ ” ’ ” in all of its applications. (California Teachers Assn, v. State of California (1999) 20 Cal.4th 327, 338 [84 Cal.Rptr.2d 425, 975 P.2d 622]; Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; Arcadia Unified School Dist. v. State Dept, of Education (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438].)
We are satisfied that the exemption authorized by sections 25373 and 37361 does not give rise to any of the evils the First Amendment and article I, section 4 seek to avoid. The exemption does not constitute sponsorship of, an award of governmental financial support to, or active involvement by the state in (Walz, supra, 397 U.S. at p. 668 [90 S.Ct. at p. 1411]) the religious enterprises of the owners of property made eligible for exemption at the option of the owner. The exemption does no more than permit a property owner to exempt its property from a landmark preservation law if the owner determines in a public forum that application of the law will cause substantial hardship that is likely to deny the owner economic return on the property, or deprive the owner of reasonable or appropriate use of its property in furthering the owner’s religious mission.
1. Secular purpose.
Addressing the Court of Appeal decision, plaintiffs contend that the court erred in failing to properly apply this prong of the Lemon test under which, they argue, the exemption fails. They argue that the exemption in issue cannot be sustained because local preservation laws do not impose a special burden on religion. They assume that all landmark preservation laws create administrative and economic burdens on all property owners, but argue that economic costs do not constitute a substantial burden under the free exercise clause. Therefore, they contend, the state may not, under the guise of accommodating religious exercise, grant religious groups a direct economic benefit that is not available to secular property owners. In sum, plaintiffs argue, the exemption does not have a proper secular purpose.
The state disagrees and argues that a religious exemption is permissible if a potential free exercise violation is present. We agree. Although application of a landmark preservation law to property owned by a religious entity does *710 not violate a religious entity’s free exercise rights, insofar as the law may burden that right, an accommodating exemption is a proper, constitutionally permissible, secular purpose. (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 335 [107 S.Ct. at p. 2868].) The exemption in question here seeks only to relieve religious entities of a potential burden on free exercise.
As noted earlier, the Court of Appeal assumed that the exemption of noncommercial property owned by religious entities from local landmark preservation laws would not contravene the establishment clauses of the First Amendment or article I, section 4, if the Legislature had a rational basis for believing that such local ordinances did or might be perceived as substantially deterring the owners’ free exercise of their religious beliefs.[5] The court reasoned: “The state may lawfully act to reduce a burden on the religious freedom of those within its jurisdiction, especially where the *711 burden is one imposed by the state itself. In doing so the state is not restricted to instances where an actual burden on religious freedom exists. Between intrusion prohibited by the free exercise clause and assistance prohibited by the establishment clause, the state must have room to maneuver. In this instance, given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim.”
We do not agree with plaintiffs or the dissent that a religious exemption from a generally applicable law is permissible only if the law creates an actual, not simply a potential, burden on free exercise of religion. As the court said in Walz, supra, 397 U.S. at page 673 [90 S.Ct. at pages 1413-1414], and reemphasized in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at page 334 [107 S.Ct. at page 2867], “[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise clause.” While in some circumstances an actual burden may be necessary to justify a judicially mandated exemption to the application of a law to a religious entity, legislatively created religious exemptions are permissible if the legislative body has reason to believe that the law may impose a burden on free exercise. Employment Div., Ore. Dept, of Human Res. v. Smith (1990) 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] supports our conclusion *712 that whether an accommodating exemption is appropriate is á legislative question and that a legislative body may create an accommodating religious exemption to avoid potential burdens on the free exercise rights of religious entities. Smith was an as-applied challenge by Native Americans to the application of a state law prohibiting the use of peyote, a ban that was shown to actually, but permissibly, burden religious practices to which the use of peyote was integral. The court nonetheless declined to require that all laws imposing any burden on religious activity be justified by a compelling state interest, and thereby to create a judicial exemption to many such laws, stating that whether an accommodation to religion was appropriate was best left to the political process. (Id., at p. 890 [110 S.Ct. at p. 1606].) The high court has thus confirmed that a legislative body has broad authority to determine that accommodation is appropriate in circumstances in which a court need not exempt the religious practice from a neutral, generally applicable law.
As observed earlier, sections 25373 and 37361 do not directly exempt any property owner from application of a landmark preservation law. They do no more than permit a religious entity to exempt its noncommercial property if an objection to landmark status is made and the owner determines in a public forum that imposition of landmark status will cause the owner to “suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission.” (§§ 25373, subd. (d)(2), 37361, subd. (c)(2).)
The dissent faults this aspect of sections 25373 and 37361, even though the Legislature could have simply exempted the property. Making exemption optional, the dissent argues, is a defect that fails to assure that the religious property owner’s ability to freely exercise its religion has in fact been burdened. We do not agree that an actual burden must be demonstrable before an exemption is constitutionally permissible. If the Legislature could reasonably anticipate that imposing landmark status on the noncommercial property of religious organizations might significantly burden free exercise, an exemption is constitutionally permissible. Since the Legislature could have created a blanket exemption, an optional exemption that encourages maintenance of landmark status whenever possible is not constitutionally defective.
We are satisfied that the Legislature could reasonably believe that the restrictions accompanying designation as a historical landmark under local ordinances in California may burden the ability of a religious entity that *713 owned the property to carry out its religious mission and that an accommodating exemption was appropriate. The Legislature was aware of the restrictions a historic preservation ordinance imposes on the landmark property and had before it the anecdotal evidence noted above of actual burdens on religious entities whose noncommercial property had been designated a landmark. (Ante, at fn. 5.) Those restrictions, including limitation of the right to alter or demolish a designated landmark and responsibility to maintain the structure without access to governmental disaster or other assistance, may impose significant financial burdens on the owner of the property. Any significant financial burden, or simply the inability to demolish or alter a structure that is no longer suited to the needs of the owner, could affect the ability of many owners to carry out their religious missions. We do not agree with the dissent, therefore, that the exemption is impermissibly broad, because it recognizes that landmark status for their noncommercial property may create an indirect, but nonetheless substantial, burden on religious organizations. The Legislature could reasonably conclude that the potential burden of landmark designation justified an accommodating exemption for noncommercial properties owned by religious entities.
As the Supreme Court explained in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at page 335 [107 S.Ct. at page 2868], the secular purpose test is met if the government remains neutral in religious matters. It is a permissible neutral purpose to alleviate a significant governmental interference with the ability of a religious organization to carry out its religious mission. As the Court of Appeal concluded: “Between intrusion prohibited by the free exercise clause and assistance prohibited by the establishment clause, the state must have room to maneuver. In this instance, given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim.”
Inasmuch as the Legislature could reasonably believe that landmark designation may result in denying the owner the economic benefit and appropriate use of the property necessary to fulfill the owner’s religious mission, the exemption authorized by sections 25373 and 37361 meets the secular purpose test and thus satisfies the first prong of the Lemon test.
2. Principal or primary effect that neither advances nor inhibits religion.
Plaintiffs argue that the Court of Appeal also erred in holding that the exemption does not advance religion, but only facilitates the efforts of *714 religious entities to advance their own purposes. They claim that the exemption from landmark status provides significant economic advantages to religious groups at the expense of neighboring property owners. Unlike the tax exemption considered by the court in Texas Monthly, Inc. v. Bullock, supra, 489 U.S. 1, however, exempting a property from landmark status does not have the effect of subsidizing the owner at the expense of other owners of landmarked property. The only impact of the exemption is that the owner may continue to use the property as it sees fit (subject to other applicable laws) to further its religious mission unrestricted by the historic preservation law. “A law is not unconstitutional simply because it allows churches to advance religions, which is their very purpose. For a law to have forbidden ‘effects’ under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence.” (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 337 [107 S.Ct. at p. 2869].) Permitting a religious body to use its noncommercial property in the manner it did before a restrictive law was imposed on it does not constitute an impermissible advancement of religion by the state simply because some such property may be used to propagate the owner’s religious message. {Ibid.) That the owner may enjoy an economic advantage over secular owners of landmark properties is not relevant. Unlike an exemption from taxes, an exemption from landmark status does not create a subsidy for religious activity by forcing other property owners to be vicarious donors or, since it does no more than permit use of the property as it was before landmark designation, convey any message of governmental endorsement of religion.
The effort of the dissent to identify a means by which an exemption for landmark status subsidizes religious activity at the expense of the owners of other landmark properties or the community finds no support in the authorities on which it relies. There is no measurable or identifiable cost to others that can be attributed to an exemption from landmark status. The dissent suggests that when an owner exempts property from landmark status the exemption constitutes a subsidy in the form of a valuable privilege and creates a cultural and historic deficit that the community must make up. But no community is required to have a historical landmark ordinance and those that have such ordinances need not designate all eligible properties. The historical and cultural deficit, if such there be, can exist as easily from failure to designate as from the occasional exercise of the option to exempt a property. Indeed, the dissent itself recognizes that the subsidy to which the court referred in Texas Monthly was one that necessarily resulted from a tax exemption—the need to offset the lost revenue through higher taxes on the nonexempt class.
*715 That other nonprofit organizations do not benefit is not relevant in assessing neutrality since landmark status for properties they own does not threaten any free exercise rights of those organizations. Mitchell v. Helms (2000) 530 U.S. 793 [120 S.Ct. 2530, 147 L.Ed.2d 660], on which the dissent also relies for the argument that this exemption is not neutral or evenhanded, is simply not on point. The decision has nothing to do with the validity of an accommodating religious exemption from a neutral historic preservation law. The focus of the court in Mitchell v. Helms was pointedly and exclusively on application of the Lemon test, as adapted in Agostini v. Felton (1997) 521 U.S. 203 [117 S.Ct. 1997, 138 L.Ed.2d 391], to governmental assistance to parochial schools. Nothing in that decision supports the conclusion of the dissent that permitting an exemption of noncommercial property[6] owned by a religious entity from a law that may burden free exercise of religion is not neutral and evenhanded.
We therefore agree with the Court of Appeal that permitting a religious organization to continue using its property in the manner it would have done but for landmark designation is not an impermissible endorsement of religion and the use of the property cannot be attributed to the state. (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 337 [107 S.Ct. at p. 2869].) No burden is shifted from the religious entity that owns the property to owners of other landmark properties. The second prong of the Lemon test is satisfied.
3. Excessive governmental entanglement with religion.
Plaintiffs also contend that permitting a religious entity to invoke an exemption to landmark preservation laws does not simply restore to religious entities the power to affect their own interests, as the Court of Appeal reasoned, but necessarily enmeshes those bodies in a substantial exercise of governmental power.
*716 To determine if the state is impermissibly entangled with religious activity under the Lemon test, the court considers “the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority.” (Lemon, supra, 403 U.S. at p. 615 [91 S.Ct. at p. 2112]; see also Swaggart Ministries v. Cal. Bd. of Equalization (1990) 493 U.S. 378, 393 [110 S.Ct. 688, 697-698, 107 L.Ed.2d 796].)
Here, of course, religious institutions benefit from the exemption. However, the state provides no aid other than leaving noncommercial properties owned by religious entities alone if the owner seeks exemption. The exemption process does not create any relationship between those entities and the state.
The state itself is not implicated in the exemption process. The owner, after objecting to imposition of landmark status, may exempt itself from a local landmark preservation law. The owner may do so by determining in a public forum that it will suffer substantial hardship in carrying out its religious mission because the restrictions accompanying that status will deprive it of the economic benefit it would otherwise receive from the property when that benefit is necessary to carry out the owner’s religious mission, will deprive it of the reasonable use of the property to carry out the owner’s religious mission, or will deprive it of a use appropriate to carrying out the owner’s religious mission.
None of this enmeshes the government in religion. There is no delegation of substantial governmental authority to the religious entities that own exempt properties, and thus no entanglement between them and the state. Unlike the authority granted to churches to preclude the grant of liquor licenses to establishments near a church or school that was found to violate the establishment clause in Larkin v. Grendel’s Den, Inc. (1982) 459 U.S. 116 [103 S.Ct. 505, 74 L.Ed.2d 297], here there is no opportunity for favoritism by the religious entity and no appearance of joint exercise of legislative power by the church and the state. The exercise of legislative power ends with the enactment of the enabling statutes.
While the nature of the public forum in which the hardship determination is made is not fixed by sections 25373 and 37361, it is not a governmental forum. The requirement that the determination of substantial hardship be made in a public forum appears to contemplate a public hearing at which the owner’s assertion of hardship may be questioned, but there is no requirement of governmental approval or review of a hardship determination. A declaration by the owner of the property that an objection to imposition of landmark *717 status was made, a public hearing held, and a determination of substantial hardship made and filed with the designated local agency, should suffice.
The third prong of the Lemon test is also satisfied.
The most recent federal circuit court decision addressing the establishment clause implications of an exemption statute supports our conclusion. In Ehlers-Renzi v. Connelly School of the Holy Child (4th Cir. 2000) 224 F.3d 283,[7] the law challenged on establishment clause grounds exempted parochial schools located on land owned or leased by a religious organization from a “special exception” requiremént imposed on other owners who sought to build nonresidential facilities in a residential zone. The issue arose when a Roman Catholic college preparatory school notified neighboring landowners that it had elected to exempt itself from seeking a special exception for the expansion of its facilities. The court recognized that accommodation of religion is an “authorized and sometimes mandatory aspect” of “Establishment Clause jurisprudence” (id. at p. 287), and that such accommodation satisfies the Lemon test, as adapted to exemptions in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327.
Addressing the three prongs of the Lemon test, the court reasoned that the secular purpose test was met in a facial challenge if a plausible secular purpose appeared on the face of the law. It had no difficulty in finding such a purpose. The exemption made it possible to avoid interference with the religious mission of parochial schools that might occur if they were subjected to the otherwise applicable requirements of the zoning ordinance. By allowing the exemption the county simply stepped out of the way of religion and relieved the school of having to justify its religious or religion-related needs. This also spared the county from having to resolve disputes with religious underpinnings. “In short, the low threshold of this first Lemon prong is readily cleared by the Zoning Ordinance’s plausible purpose of extricating Montgomery County from these involvements in religion.” (Ehlers-Renzi v. Connelly School of the Holy Child, supra, 224 F.3d at p. 289.) The parallel to the instant case is obvious. No actual interference was deemed necessary to justify the exemption. The courf looked only to whether the legislative body had a plausible sectarian purpose for the exemption, and, as suggested in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327, concluded that relieving the school of potential interference with its religious activity satisfied that test.
The court found the second prong of the Lemon test—whether the exemption had a principal or primary effect of advancing or inhibiting religion— *718 was also satisfied, concluding that an exemption that simply allowed a religious school to advance its purposes was not constitutionally prohibited. The government itself was not, through its own activities or influence, advancing religion. (Ehlers-Renzi v. Connelly School of the Holy Child, supra, 224 F.3d at p. 291.) The third, or excessive entanglement, prong was met since the exemption had the effect of disentangling the government from intrusion into religious matters. (Id., at p. 292.) Again, the parallels to the instant case are obvious. An exemption from a landmark preservation law simply allows the property owner to use the property as it did before landmark status was imposed. By permitting the religious organization that owns the property to exempt itself, sections 25373 and 37361 avoid any governmental entanglement with religion.
We conclude therefore, that sections 25373 and 37361 do not run afoul of the establishment clause of the First Amendment.
B. Article I, Section 4 Establishment Clause.
We reach the same conclusion under the California Constitution.
Because the California Constitution is a document of independent force, the rights it guarantees are not necessarily coextensive with those protected by the federal Constitution. (American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 325; Raven v. Deukmejian (1990) 52 Cal.3d 336, 351-355 [276 Cal.Rptr. 326, 801 P.2d 1077].) We do not believe, however, that the protection against the establishment of religion embedded in the California Constitution creates broader protections than those of the First Amendment. We are satisfied that the California concept of a “law respecting an establishment of religion” (art. I, § 4) coincides with the intent and purpose of the First Amendment establishment clause.
We reach this conclusion because the establishment clause was not added to article I, section 4 until 1974.
When article I, section 4 was readopted with minor editorial changes by the electorate as part of the constitutional revisions made in 1974, the present establishment clause was included. The Legislative Analyst and the Chairman of the Constitution Revision Commission each explained that the intent was to add to the California Constitution a right that was then contained in the federal Constitution. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) Analysis by Legis. Analyst, p. 26; id., argument in favor of Prop. 7, p. 28.) Presumably, the electorate intended that the right being added to article I, section 4 through the new establishment clause would *719 afford the same protection as the establishment clause of the First Amendment on which it was patterned. There is nothing in the history of the clause to suggest that the drafters or the electorate intended that the clause be any more protective of the doctrine of separation of church and state than the First Amendment establishment clause.
We have long emphasized that there must be cogent reasons for a departure from a construction placed on a similar constitutional provision by the United States Supreme Court. (People v. Monge (1997) 16 Cal.4th 826, 844 [66 Cal.Rptr.2d 853, 941 P.2d 1121); Raven v. Deukmejian, supra, 52 Cal.3d at p. 353; Gabrielli v. Knickerbocker (1938) 12 Cal.2d 85, 89 [82 P.2d 391].) That admonition has particular force when the expressly stated purpose of the provision was to add a protection already part of the federal Constitution to our charter of liberties. Our construction of the establishment clause of article I, section 4 is therefore guided by decisions of the Supreme Court.
Having concluded above that the exemption does not violate the establishment clause of the First Amendment, we need not address the state’s argument that an exemption from landmark preservation laws is required by the free exercise clause of the First Amendment.
C. Article I, Section 4 No-Preference Provision.
Plaintiffs also contend that exempting property owned by religious entities from landmark status violates the no-preference provision of the free exercise clause of article I, section 4. They argue that the no-preference provision of the California Constitution is a broader guarantee of separation of church and state than the establishment clause, that it is more protective of that principle than the federal Constitution (Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 883 [281 Cal.Rptr. 34, 809 P.2d 809]), and that under it, “[preference ... is forbidden even when there is no discrimination.” (Fox v. City of Los Angeles (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663].)
This court has never had occasion to definitively construe the no-preference clause of article I, section 4 and we need not do so here. In guaranteeing free exercise of religion “without discrimination or preference,” the plain language of the clause suggests, however, that the intent is to ensure that free exercise of religion is guaranteed regardless of the nature of the religious belief professed, and that the state neither favors nor discriminates against religion. Having concluded above that an exemption from a landmark preservation law satisfies all prongs of the Lemon test, it follows that the exemption is neither a governmental preference for or discrimination against religion.
*720 Neither the history nor the language of the no-preference clause supports plaintiffs’ argument that the clause bans governmental accommodation of religion or religious belief in general. We do not agree, therefore, that the no-preference clause bars exemption from landmark preservation ordinances for property owned by a religious entity as a constitutionally impermissible preference for religion and discrimination against nonreligious owners of noncommercial property subject to landmark designation.
IV

Does the Exemption from Landmark Restrictions Violate Article XVI, Section 5?

The Court of Appeal rejected plaintiffs’ argument that exempting noncommercial property owned by religious entities from the restrictions of landmark status violates the ban on aid to religion found in article XVI, section 5. It reasoned that article XVI, section 5 does not prohibit indirect, remote, or incidental benefits that have a primary public purpose.
Article XVI, section 5 provides: “Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever nor shall any grant or donation of personal property or real estate ever be made by the State, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI.”[8]
In California Educational Facilities Authority v. Priest (1974) 12 Cal.3d 593, 605, footnote 12 [116 Cal.Rptr. 361, 526 P.2d 513], this court rejected an argument that article XVI, section 5, then article XIII, section 24, prohibits only direct appropriation or expenditure of public funds to support *721 sectarian institutions: “We do not read section 24 so narrowly. Its terms forbid granting ‘anything’ to or in aid of sectarian purposes, and prohibit public help to ‘support or sustain’ a sectarian-controlled school. The section thus forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes.”
Plaintiffs argue that the Court of Appeal erred in dismissing their claim that the exemption created by sections 25373 and 37361 violates the ban on aid to religious organizations or institutions controlled by religious entities. They contend that the benefit of exemption from landmark status cannot be characterized as indirect, remote, or incidental to a primarily public purpose.
As the Court of Appeal observed, however, permitting a religious entity to exempt its noncommercial property from landmark designation status simply leaves the property in the status it otherwise occupied. While there may be a benefit as compared to properties that are subjected to landmark designation, neither the state nor the local governmental entity expends funds, or provides any monetary support, for the exempted property or its owner.
Nothing in California Educational Facilities Authority v. Priest, supra, 12 Cal.3d at page 605, footnote 12, suggests that exempting these properties from the restrictions of landmark status violates article XVI, section 5. The exemption does not give rise to any governmental involvement in the entities or institutions that benefit from the exemption, and even assuming that some parochial schools will benefit from the exemption, that benefit is not the “support” contemplated by and banned by article XVI, section 5.
We conclude therefore, that no provision of the federal or state Constitution is violated by the Legislature’s creation of exemptions from local landmark preservations laws for property owned by religious entities. As the Court of Appeal held, these exemptions simply free the owners to use the property as they would have done had the property not been designated a historic landmark.
V

Disposition.

The judgment of the Court of Appeal is affirmed.
Kennard, J., Chin, J., and Brown, J., concurred.

The free exercise and establishment clauses of the First Amendment provide: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .”

California Constitution, article I, section 4; “Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.”

Unless otherwise indicated, all statutory references are to the Government Code.

Various amici curiae claim that the exemption denies equal protection and violates article XI, section 11 of the California Constitution by delegating municipal functions to private organizations and by providing payments to religious organizations. Although these arguments were made below, the first is outside the question presented in the petition for review (Cal. Rules of Court, rule 28(e)(2)), and plaintiffs no longer rely on and have not made any argument in this court addressed to the second other than an argument that delegation of the power to exempt properties from landmark designation excessively entangles church and state in violation of the establishment clause. Therefore, we do not address them. (See San Franciscans for Reasonable Growth v. City and County of San Francisco (1989) 209 Cal.App.3d 1502, 1515, fn. 10 [258 Cal.Rptr. 267].)

Because this action arises as a facial challenge to the exemption (§§ 25373, 37361), the record made in the superior court includes no evidence that application of local landmark preservation ordinances to noncommercial property owned by religious organizations burdens free exercise of religion. Amici curiae Pacific Union Conference of Seventh-Day Adventists et al. request judicial notice of documents that were addressed to the Legislature and the Governor encouraging passage and signing of Assembly Bill No. 133, which permanently added the exemption to sections 25373 and 37361.
Ironically, since San Francisco is now a plaintiff seeking to overturn the exemption, one of the documents is a letter from Willie Lewis Brown, Jr., then Speaker of the Assembly and now Mayor of San Francisco, to the Governor, and another is a letter from Frank M. Jordan, then Mayor of San Francisco, to the Assembly Local Government Committee. Each communication suggested that landmark designation had imposed an indirect burden on the owners’ ability to carry out their religious mission. Inasmuch as these documents may be considered legislative history and are authenticated, we may take judicial notice of them. (Evid. Code, §§ 452, 459.) Therefore, since the documents are relevant to the purpose of the exemption and to whether the Legislature could reasonably believe that imposing landmark status on noncommercial property owned by a religious entity could burden the owners’ free exercise of religion, the request for judicial notice is granted.
The documents contain the following representations.
Speaker of the Assembly Brown, who was the author of Assembly Bill No. 133, stated that religious congregations were facing difficult decisions on how best to use limited financial resources to carry out their religious missions and, particularly in San Francisco, were faced with very high seismic retrofit costs for older buildings that had been or were subject to landmark designation but could not qualify for assistance from the Federal Emergency Management Agency (FEMA). In support of this assertion, he attached to his letter a photo of the Korean United Methodist church building that the congregation had outgrown and had decided to sell. A willing buyer was located, but withdrew the offer when the board of supervisors voted to designate the building a landmark.
A second building, St. Mark’s Lutheran Church, had been designated a landmark. Its 300-person congregation faced seismic retrofit expenses of up to $5 million, which could be substantially reduced if it rebuilt the tower and campanile of the structure, an action not permitted for a landmark structure. The church also owned and operated a residential tower for low-income seniors. To retrofit the church, either the residential tower or the church *711 building itself would have to be sold. Either sale would disrupt the ability of the church to fulfill its religious mission.
The third structure was Sacred Heart Catholic Church, originally built for 10,000 parishioners, which then had a congregation of 180 people. Damaged in the 1989 Loma Prieta earthquake, the church faced repair and retrofit costs estimated at $5 million, and was ineligible for FEMA assistance. Funds from the congregation were used to subsidize children in the school operated by the church. The church had decided it would be best to replace the structure with a smaller chapel, at which point the board of supervisors had voted to designate the building a landmark. The church believed it would have been bankrupt if the landmark designation had not been suspended by the temporary legislative moratorium enacted the year before Assembly Bill No. 133 was proposed.
Mayor Jordan emphasized the “disproportionate” financial burden associated with landmark designation imposed on religious communities that are ineligible for governmental assistance. He also asserted that “landmarking laws erode the ability of religious leaders to exercise their fiduciary responsibilities in light of the pastoral mission.”
The third document is a Senate Rules Committee digest and report prepared for the third reading of Assembly Bill No. 133 by the bill’s author. The report stated that in the prior year, the Catholic Archbishop of San Francisco had expressed concern about his ability to expand church sites if local officials adopted historic preservation regulations. The arguments in support of the bill again asserted the disproportionate financial burden on religious communities by landmarking and the unavailability of governmental assistance to relieve that burden. The arguments against the bill included its preemptive effect on local ordinances and the ability of local government to designate landmarks and historic districts.

The dissent construes “noncommercial” as referring to all forms of real property that are not zoned commercial. In context, it seems clear, however, that the Legislature had in mind property whose use is related to the religious entity’s fulfillment of the owner’s religious mission but is not used for profitmaking purposes. It is true that this could include rental property as some religious entities provide housing for teachers, nurses, students, and other personnel of their affiliated noncommercial operations. It is true also that noncommercial property could include a warehouse—one used to store food or clothing for charitable distribution. It might include a gymnasium, school, hospital, senior citizens home, or agricultural property used to provide rehabilitative employment and food used for religious and charitable purposes. The descriptive term used by the Legislature is appropriate to all of these uses.
While the dissent expresses concern that the exemption on its face is overbroad and may be abused, this case does not present any issue regarding an exemption that is claimed for any reason other than enabling the religious entity to use the property to better fulfill its religious mission.

Reversing Renzi v. Connelly School of Holy Child (D.Md. 1999) 61 F.Supp.2d 440, on which the dissent nonetheless relies.

The exception found in subdivision (2) of section 3 of article XVI continues the authorization for aid to orphanages operated by religiously affiliated entities, providing: “The Legislature shall have the power to grant aid to the institutions conducted for the support and maintenance of minor orphans, or half-orphans, or abandoned children, or children of a father who is incapacitated for gainful work by permanent physical disability or is suffering from tuberculosis in such a stage that he cannot pursue a gainful occupation, or aged persons in indigent circumstances—such aid to be granted by a uniform rule, and proportioned to the number of inmates of such respective institutions.”