**Barbara MADSEN, Plaintiff,**

v.

**ASSOCIATED CHINO TEACHERS,**
**Does 1–100, Inclusive,**
**Defendants.**

**No. EDCV0300651VAPSGLX.**

United States District Court,
C.D. California.

April 19, 2004.

Mark W. Bucher, Bucher & Palmer, Tustin, CA, for Barbara Madsen, Plaintiff.

Joseph R. Colton, California Teachers Association, Santa Fe Springs, CA, for Associated Chino Teachers, Defendant.

Brent D. Grider, Brent D. Grider Law Offices, Norco, CA, for Barbara Madsen, Plaintiff.

Michael D. Hersh, California Teachers Association, Santa Fe Springs, CA, for Associated Chino Teachers, Defendant.

John Frederick Kohn, California Teachers Association, Santa Fe Springs, for Associated Chino Teachers, Defendant.

Robert Einar Lindquist, California Teachers Association, Santa Fe Springs, for Associated Chino Teachers, Defendant.

Brenda E. Sutton–Wills, California Teachers Association, Santa Fe Springs, CA, for Associated Chino Teachers, Defendant.

Beverly Tucker, California Teachers Association, Santa Fe Springs, for Associated Chino Teachers, Defendant.

Rosalind D. Wolf, California Teachers Association, Santa Fe Springs, CA, for Associated Chino Teachers, Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PHILLIPS, District Judge.

Plaintiff's and Defendant's Motions for Summary Judgment came before the

Court for hearing on April 19, 2004. After reviewing and considering all papers filed in support of, and in opposition to, the Motions, as well as the arguments advanced by counsel at the hearing, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## I. PROCEDURAL HISTORY

In October 2002, Barbara Madsen, a teacher in the Chino Valley School District, filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). [Declaration of Don Bridge ("Bridge Decl.") ¶ 2, Exs. 8–10.] Ms. Madsen alleged that Defendant Associated Chino Teachers ("ACT"), the exclusive bargaining agent for teachers in the Chino Valley School District, discriminated against her based on her religion by requiring her to pay to a charity the equivalent of the full union dues. [*Id.* Ex. 10.] The EEOC issued a "right-to-sue" letter on November 7, 2002.

On April 24, 2003, Ms. Madsen filed suit in California Superior Court against ACT. In her Complaint, Ms. Madsen alleged the following claims: (1) violation of the California Fair Employment and Housing Act (Cal. Gov.Code § 12940(b)), (2) violation of Title VII § 703 of the 1964 Civil Rights Acts (42 U.S.C. § 2000e–2(c)); (3) violation of equal protection under the Fourteenth Amendment to the United States Constitution, and (4) violation of the Establishment Clause of the First Amendment to the United States Constitution and of the "No Preference" Clause of the California Constitution.

The case was removed on June 9, 2003. On February 26, 2004, Defendant filed a Motion for Summary Judgment ("Def.Mot."). On February 27, 2004, Plaintiff filed a Motion for Summary Judgment ("Pl.Mot."). On March 12, 2004, each party filed opposition briefs ("Pl. Opp'n" and "Def. Opp'n"). On March 19, 2004, each party filed reply briefs ("Pl. Reply" and "Def. Reply").[1]

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

## III. UNCONTROVERTED FACTS

The parties agree that no genuine issues of material fact remain. [*See* Def. Mot. at 3.15–4.23; Pl. Mot. at 7:18.] The following facts are relevant and uncontroverted.[2]

Defendant ACT is the exclusive bargaining agent, under California Government Code § 3540, et seq., for a bargaining unit of the certificated employees (teachers) of the Chino Valley School District. [Bridge Decl. ¶ 2.] ACT and the school district are parties to a September 26, 2001 collective bargaining agreement and a Memorandum of Understanding ("MOU"). [*Id.* ¶ 3, Ex. 1.] The MOU states that all unit members must either become a member of ACT or a "fee payer." [*Id.*] An agency fee payer is

---

1. The Court reminds the parties that they must follow the Local Rules, particularly Local Rule 11–3.1.1, which requires use of 14–point font in all documents, including footnotes, filed with the Court.

2. To the extend the parties have proposed argumentative or disputed facts, they are not included here. Because the Court has restated the relevant facts, it does not adopt either parties' proposed "Statement of Uncontroverted Facts."

not a member of ACT but pays a "representation fee" equivalent to that portion of the membership dues which is used for representation. [Bridge Decl. ¶ 2; Plaintiff's Amended Statement of Facts ("Pl.'s Facts") Ex. 1.]

Each year, teachers who declare themselves to be agency fee payers are notified of the amount and types of expenditures made by ACT. [Bridge Decl. ¶ 4.] The notice also informs them of their right to object to the fee or to challenge its calculation. [*Id.*] If an agency fee payer objects to money being spent on items not germane to ACT's representational activities, the fee will be reduced by the percentage expended on such items plus a 5% cushion. [*Id.* ¶ 5.] An agency fee payer's objections may be based on religious, ideological, or political convictions. [Pl.'s Facts Ex. 2.]

For the 2002–2003 school year, ACT's membership dues were $782.00. [Bridge Decl. ¶ 6.] Agency fee payers who objected to the expenditure of money on items not germane to ACT's representation were permitted to pay a reduced fee of $484.74. [*Id.*] In that year, ACT represented approximately 1550 employees. [*Id.* ¶ 7.] Of these, 54 teachers declared themselves to be agency fee payers [*Id.*] Of those, 36 did not object to ACT's expenditure of money and paid the full amount of the agency fee, or $782.00. [*Id.*] The remaining 18 agency fee payers submitted objections and paid the reduced fee of $484.74. [*Id.*]

The ACT MOU also sets forth an exception to the membership requirement for "religious objectors." [Bridge Decl. ¶¶ 8–9, Ex. 1; Pl.'s Facts Ex. 1.] A religious objector "shall not be required to join or financially support [ACT] as a condition of employment, except that such unit member shall pay, in lieu of a service fee, sums equal to such service fee" to a charitable organization. [*Id.*] A religious objector is distinguishable from an agency fee payer in that the former objects on religious grounds to supporting ACT in any way while the latter objects on religious or other ideological grounds to contributing money for certain items. [*See* Bridge Decl. Ex. 3, Pl.'s Facts Ex. 2.]

Plaintiff Barbara Madsen is a certificated employee of the school district who has been granted religious objector status. [Bridge Decl. ¶¶ 1, 10–11, Ex. 4; Pl.'s Facts ¶ 2, Ex. 3.] In an August 15, 2002 letter to Don Bridge, President of ACT, Ms. Madsen wrote.

> Given that fee payers receive a rebate for that portion of union dues used for ideological and political purposes, the balance of their fees is a little over $200.00 less than the full dues structure. I am also requesting that I pay the same reduced amount as with other fee payers to the charity of my choice. It is discriminatory to require a religious objector to pay a greater sum than that of other agency fee payers.

[*Id.*]

On August 27, 2002, Mr. Bridge replied to Ms. Madsen's letter, notifying her that she would be permitted to pay "an amount equal to the membership fees," $782.00, to a charity. [Bridge Decl. ¶ 12, Ex. 5; Pl.'s Facts ¶ 3, Ex. 4.] Mr. Bridge went on to explain that Ms. Madsen, as a religious objector, would not be entitled to pay the reduced fee amount of $484.74. [*Id.*]

Ms. Madsen paid the equivalent of the membership dues to the American Cancer Society. [Pl.'s Facts ¶ 4, Ex. 5; Bridge Decl. Ex. 6.] She acknowledges that, throughout this process, she was not treated in a hostile manner by ACT and that she has not been inhibited in the practice of her religion. [Declaration of Joseph R. Colton Ex. 1. (Madsen Dep.) at 36.7–12, 44.6–11.]

## IV. DISCUSSION

Both parties agree on the material facts. Because only questions of law remain, the

case is proper for resolution upon the Motions for Summary Judgment before the Court. Each of Plaintiff's claims is considered in turn.

## A. TITLE VII AND FEHA

Ms. Madsen alleges discrimination based on religion in violation of the California Fair Employment and Housing Act ("FEHA"), California Government Code § 12940(b), and Title VII of the 1964 Civil Rights Act [*See* Compl. ¶¶ 13–18.]

■ The analysis of a religious discrimination claim is the same under FEHA and Title VII. "Title VII of the Federal Civil Rights Act of 1964 is the federal counterpart to FEHA." *Rodriguez v. Airborne Express,* 265 F.3d 890, 896 (9th Cir.2001). California Courts have observed that "[a]lthough the wording of [T]itle VII differs in some particulars from the wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical." *Beyda v. City of Los Angeles,* 65 Cal.App.4th 511, 517, 76 Cal.Rptr.2d 547 (1998), *quoted in Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir.2000).

"In an area of emerging law, such as employment discrimination, it is appropriate to consider federal cases interpreting [T]itle VII." *Id.* "Since the antidiscrimination objectives and public policy purposes of [FEHA and Title VII] are the same, [the Court] may rely on federal decisions to interpret analogous parts of the state statute." *Okoli v. Lockheed Tech. Operations Co.,* 36 Cal.App.4th 1607, 1614

n. 3, 43 Cal.Rptr.2d 57 (1995), *quoted in Brooks,* 229 F.3d at 923. Where a plaintiff alleges discrimination based on religion, a court may rely on federal Title VII law alone. *See, e.g., Cook v. Lindsay Olive Growers,* 911 F.2d 233, 241 (9th Cir.1990). The following analysis resolves Plaintiff's Title VII and FEHA claims.

Title VII provides in part "It shall be an unlawful employment practice for an employer (1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a). "The proscription against religious discrimination applies equally to a labor organization." *Yott v. North Am. Rockwell Corp.,* 602 F.2d 904, 907 (9th Cir.1979) (citing 42 U.S.C. § 2000e–2(c)). "The term 'religion' includes all aspects of religious observation and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

"A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate." *Peterson,* 358 F.3d at 603 (citing *Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1017–18 (4th Cir.1996), *Mann v. Frank,* 7 F.3d 1365, 1368–70 (8th Cir.1993)). In arguing that ACT discriminated against her because of her religious beliefs, Ms. Madsen only relies upon a disparate treatment theory.[3]

---

**3.** With respect to the Title VII claim, Ms. Madsen's Complaint alleges that violation of the statute "is the direct result of Defendant charging Plaintiff a higher fee than other similarly situated non-member employees." [Compl. ¶ 17.] This statement of the claim clearly is based on a disparate treatment theory. Still, Defendant worries that Plaintiff may

be relying on a failure to accommodate theory implicitly. [Def. Reply at 3.21–4:1.] Any argument that Ms. Madsen may have been able to make based on a failure to accommodate theory was waived expressly in her Opposition: "Plaintiff does not argue that contribution to a charity is not reasonable accommodation.

■ Ms. Madsen will have the burden of proof at trial on her Title VII disparate treatment claim. To survive ACT's Motion for Summary Judgment, Ms. Madsen must "provide evidence, either direct or circumstantial, to support a reasonable inference that [her treatment] was discriminatory." *Peterson,* 358 F.3d at 603 (citing *Chalmers,* 101 F.3d at 1017). Ms. Madsen has "the burden of establishing a prima facie case by showing that (1)[s]he is a member of a protected class, (2)[s]he was qualified for [her] position, (3)[s]he experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* (presenting the "burden-shifting framework" of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and citing *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123 (9th Cir.2000), *Lyons v. England,* 307 F.3d at 1092, 1112–14 (9th Cir.2002), *Mandell v. County of Suffolk,* 316 F.3d 368, 377–78 (2d Cir.2003)). It is with respect to the fourth requirement that Ms. Madsen's Title VII claim fails.

■ As explained above, ACT's membership requirements create three groups of employees: members, agency fee payers, and religious objectors. Ms. Madsen claims that agency fee payers and religious objectors are similarly situated but that religious objectors are discriminated against in that they must pay $782.00 to a charity, the same amount that members pay in dues, while agency fee payers pay only $484.74 in representation fees. [*See* Pl. Opp'n at 5:20–26.]

ACT argues that the three groups have different characteristics and, importantly, members and agency fee payers pay money to ACT while religious objectors do not. This, ACT argues, rationally explains the difference in the treatment of the two groups. [Def. Reply at 6:15–21.] Ms. Madsen responds

> Given the logic of defendant's statements, *"they pay no money at all to the union",* then what difference does it make if the religious objector pays to charity the lower amount? It would matter only to the charity, a third-party beneficiary to the arrangement. As between the union and the objector, there is no effect whatsoever. The impact of this rationale is that those who are religious objectors are "punished" for having so declared, while some who would be religious objectors become agency fee payers instead, to accommodate the scheme. And the union pockets the difference.

[Pl. Opp'n at 5:20–26.]

Ms. Madsen's analysis is flawed for three reasons. (1) it disregards the purpose of the union security laws which guide ACT's policy, (2) Ms. Madsen has declared that she is not similarly situated to agency fee payers and has requested that she be treated differently, and (3) if Ms. Madsen were allowed to pay only $484.74 to a charity, she would be treated more favorably than other school district employees. *See Peterson,* 358 F.3d at 603.

ACT's policy with regards to agency fee payers and religious objectors conforms with the California Education Employment Relations Act ("EERA"), California Government Code § 3540, et seq. The purpose of the Act is:

> the improvement of personnel management and employer-employee relations within the public school system in the State of California by providing a uni-

Plaintiff argues that the amount required to be contributed to a charity by the union constitutes discrimination." [Pl. Opp'n at 7.18–20.]

form basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by the organization in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulations of educational policy.

Cal. Gov.Code § 3540. So as to ensure effective representation by the exclusive representative of a bargaining unit, public school employees "shall be required, as a condition of continued employment, to join the recognized employee organization or to pay the organization a fair share services fee." Cal. Gov.Code § 3543(a).

Though common membership to the union is important for effective representation, the EERA provides public school employees with two alternatives to full membership. First

Agency fee payers shall have the right ... to receive a rebate or fee reduction upon request, of that portion of their fee that is not devoted to the cost of negotiations, contract administration, and other activities of the employee organization that are germane to its function as the exclusive bargaining representative.

Cal. Gov.Code § 3546(a). Second.

[A]ny employee who is a member of a religious body whose traditional tenets or teachings include objections to joining or financially supporting employee organizations shall not be required to join, maintain membership in, or financially support any employee organization as a condition of employment, except that such employee may be required, in lieu of a service fee, to pay sums equal to

such service fee ... to a ... charitable fund ... chosen by the employee.

Cal. Gov.Code § 3546.3.

The representative organization is to secure "advantages in wages, hours, and other conditions of employment" for all represented employees, whether members, agency fee payers, or religious objectors. *See* Cal. Gov.Code § 3546(b). "Moreover, in carrying out these duties, the union is obliged 'fairly and equitably to represent all employees ..., union and nonunion.'" *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 222, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

Because all employees receive the benefits of union membership, it is appropriate that exceptions to the membership requirement be narrowly drawn. Doing so distributes, as fairly as possible, the cost of the union's activities among those who benefit, "and it counteracts the incentive that employees might otherwise have to become 'free riders' to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Id.* (citing *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 761, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), *Oil Workers v. Mobil Oil Corp.*, 426 U.S. 407, 415, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), *NLRB v. General Motors*, 373 U.S. 734, 740–41, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963)); *see also Yott*, 602 F.2d at 909. (addressing the "friction" within a company that resulted from "free-riders" who paid "neither union dues nor the equivalent thereof to a charity" and yet received the benefits of the collective bargaining). ACT's membership policy follows the EERA and counteracts the friction that would result within the school district if religious objectors were perceived by other employees to be "free riders."

As the groups are defined, agency fee payers are different from religious objectors. Agency fee payers, unlike religious

objectors, do not object to union membership per se, but only request that their money not be used for certain purposes. The nature of the objections lodged by each group are different and it is appropriate for ACT to tailor the accommodations to the specific needs of each.

ACT members must finance the benefits provided to religious objectors. By recognizing the distinction between religious objectors and agency fee payers, ACT is able to minimize the burden on its membership. Because religious objectors cannot be required to pay any money to ACT, the only way to treat agency fee payers and religious objectors identically would be to excuse all objectors from paying ACT and allow them to pay a charity instead. This, however, would have the undesirable result of forcing the membership to shoulder an even greater burden. It is appropriate that ACT encourage employees who only object to the use of some funds to become agency fee payers rather than religious objectors. These employees can act in accordance with their consciences while paying for the benefits they receive Ms. Madsen has declared, however, that she is dissimilar to agency fee payers and has demanded that she be treated differently. ACT has accommodated her demands and appropriately treated differently situated groups differently.

To the extent that Ms. Madsen *is* similarly situated with other school district employees, she has been treated the same and is not entitled to receive more favorable treatment. This is made clear by considering both agency fee payers and religious objectors in relation to members. The dues paid by members can be divided into two parts. One portion of the dues funds representation of the employees and one portion funds ideological activities. Members pay the representation fee and receive representation. In addition, they pay for the support of ideological activities and receive the benefit of having ACT support ideological causes with which they agree. In other words, members pay for what they receive.

Agency fee payers also pay the representation fee and receive representation. They do not pay for ideological activities but they cannot be said to receive any benefit in this regard. ACT's support of ideological causes with which agency fee payers do not agree is not a benefit to agency fee payers. They are not "free riders" because they do not receive any benefit from support of those activities that they neither agree with, nor have paid for. Thus, agency fee payers, like members, pay for what they receive.

Religious objectors pay to support ideological activities by contributing to charities of their choice. In doing so they receive the benefit of supporting ideological causes with which they agree. Religious objectors, however, do not pay a representation fee. They are the only employees who receive benefits for which they do not pay. Members and agency fee payers pay higher than proportionate representation fees so that religious objectors may receive the benefits of representation without helping to cover the cost.

There can be no support under Title VII for Ms. Madsen's request for preferential treatment, i.e., to pay to a charity an amount lower than the equivalent of ACT membership dues. *See Yott,* 602 F.2d at 908 (citing *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) and explaining that Title VII does not require an employer to give preferential treatment to some employees to accommodate their religious beliefs). Furthermore, religious objectors are not discriminated against in comparison with agency fee payers. Religious objectors receive a benefit that no other group receives. they are able to use the

full $782.00 to support a charity with which they agree and pay nothing for the representational benefits. No other group has similar control over the use of their money. It is not discriminatory to attach a small, ancillary burden to the acceptance of this benefit available to no other employees. If Ms. Madsen were required to pay only $484.74 to a charity of her choice rather than $782.00, she would receive more favorable treatment than any other group of employees because she would receive the benefits of representation and yet maintain control of the use of her money. This sort of favorable treatment is not required under Title VII.

Finally, Ms. Madsen's assertion that "some who would be religious objectors become agency fee payers instead, to accommodate the scheme," is without evidentiary support and is not a justified inference. [See Pl. Opp'n at 5:20–26.] Religious objectors are no more encouraged to become agency fee payers than are members. Both may have a hypothetical incentive to lie about their beliefs in order to expend a smaller total amount, but both stand to lose an important benefit by doing so. Members would lose the benefit of having their money support ACT's ideological causes. Religious objectors would lose the control over their money that they enjoy in being able to select a charity for contribution. If any religious objector has ever betrayed her beliefs to become an agency fee payer, though no evidentiary support for this has been offered, the union would not have "pocketed the difference" as Ms. Madsen complains. [See Pl. Opp'n at 5:20–26.] The union only would have received the fair cost of representation that would otherwise be subsidized by both the members and the agency fee payers who pay the representation fee.

In sum, to the extent that Ms. Madsen is similarly situated to agency fee payers, she has not been discriminated against. "[U]nder governing law, there can be but one reasonable conclusion as to the verdict": ACT's treatment of Ms. Madsen is not illegally discriminatory under Title VII or FEHA. See Anderson, 477 U.S. at 250, 106 S.Ct. 2505.

## B. THE ESTABLISHMENT AND "NO PREFERENCE" CLAUSES

Ms. Madsen alleges violation of the Establishment Clause of the First Amendment to the United States Constitution and the "No Preference" Clause of the California Constitution (Article I, § 4) via 42 U.S.C. § 1983. [Compl. ¶ 24.]

Generally, private persons and organizations, such as Defendant ACT, cannot be liable under § 1983 unless their actions were "clothed" with governmental authority, i.e., the private persons were "willful participants in joint activity with the state or its agents." Sykes v. Cal. Dep't of Motor Vehicles, 497 F.2d 197, 200 n. 2 (9th Cir.1974). Here, though Ms. Madsen alleges that Defendant "acted under color of state law," the record is devoid of any evidence thereof. [See Compl. ¶ 24; Pl. Mot. at 9:9.] Neither side has addressed whether Plaintiff's claim is brought properly under § 1983 and instead discuss only the constitutional challenges to the California union security laws (Cal. Gov.Code §§ 3543, 3546) in accordance with which Defendant acted. Because Defendant is entitled to summary judgment on the merits of the constitutional claims, the Court need not, and has not, considered whether § 1983 is the proper procedural vehicle for Plaintiff's claims.

■ Ms. Madsen alleges violation of the Establishment Clauses of both the California and United States Constitutions. [Compl. ¶ 24.] The California Supreme

Court has stated that the State Constitution's protection against the establishment of religion does not create broader protections than those of the First Amendment to the United States Constitution. *East Bay Asian Local Dev. Corp. v. California,* 24 Cal.4th 693, 718, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000). Rather, "the California concept of a 'law respecting an establishment of religion' (art. I, § 4) coincides with the intent and purpose of the First Amendment establishment clause." *Id.* The California Supreme Court concluded that its construction of Article I, § 4 of the California Constitution is "guided by the decisions of the [United States] Supreme Court." *Id.* Both claims may be disposed of with the same analysis.

■ "The Establishment Clause ensures government neutrality in matters of religion." *Tooley v. Martin–Marietta Corp.,* 648 F.2d 1239, 1245 (9th Cir.1981) (citing *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)). "While the government must avoid 'partiality to any one group,' ... it may deviate from absolute rigidity to accommodate the religious practices of each group." *Id.* (citing *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952); *Walz v. Tax Comm'n,* 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

■ "[T]o pass muster under the Establishment Clause the law in question first must reflect a clearly secular legislative purpose ..., second, must have a primary effect that neither advances nor inhibits religion ..., and, third, must avoid excessive government entanglement with religion." *Committee for Public Ed. & Religious Liberty v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (internal citations omitted); *see also Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), *Tooley,* 648 F.2d at 1245.

## 1. Legislative Purpose

■ As stated above, the purpose of the EERA is the improvement of employer-employee relations within the public school system by recognizing the right of employees "to select one employee organization as the exclusive representative of the employees." Cal. Gov.Code § 3540. Though common membership to the union that is the exclusive representative of the employees is important for effective representation, the EERA provides two exceptions to the membership requirement for agency fee payers and religious objectors. *See* Cal. Gov.Code §§ 3546(a), 3546.3. These exceptions have the purpose of accommodating the free exercise of religion as required under the First Amendment. *See generally Abood,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261; *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 302, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) ("[T]he objective [of such procedures] must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.") (quoting *Abood,* 431 U.S. at 237, 97 S.Ct. 1782). This is a legitimate secular legislative purpose *See Tooley,* 648 F.2d at 1245 (finding that legislation intended to "assure that freedom from religious discrimination in employment of workers is for all time guaranteed in law" has a "legitimate secular purpose.").

## 2. Primary Effect

Ms. Madsen argues that "[b]ecause ACT singles out religious objectors to pay a higher fee than non-religious objectors, they are effectively inhibiting religion, as well as, favoring non-religion over religion." [Pl. Mot. at 1021–22.] The record reveals that Ms. Madsen feels that the requirement that she pay the fee to her

charity does not inhibit the practice of her religion. [*See* Madsen Dep. at 36:7–12.] In addition, the ACT policy does not favor "non-religion over religion" as Plaintiff suggests. Agency fee payers include people who object to ACT's use of funds on the basis of both religious and other ideological grounds Those whose religious beliefs prevent them from associating with a union at all may become religious objectors. There is no categorical distinction based on religion. Rather, the exceptions are drawn narrowly to accommodate employees' specific religious beliefs.

To support her claim, Plaintiff must argue that the difference in the treatment of religious objectors from religious and ideological agency fee payers inhibits religion. In *Tooley v. Martin–Marietta Corp.*, the Ninth Circuit held that a similar policy which allowed Seventh–Day Adventists to pay an equivalent contribution to a charity did not violate the Establishment Clause because the policy did not have a "primary effect which either advances or inhibits the plaintiff's religion." 648 F.2d at 1245–46. The Court reasoned that "[a] religious accommodation does not violate the Establishment Clause merely because it can be construed in some abstract way as placing an inappreciable but inevitable burden on those not accommodated." *Id.* at 1246. As explained above, the different treatment of agency fee payers and religious objectors arises from the specific accommodation of the beliefs of each group. Any benefit to agency fee payers is not appreciable because religious objectors receive the unique benefit of having control over their full expenditure of money. The ACT policy based on the EERA "does not have a primary effect which either advances or inhibits the plaintiff's religion." *Id.*

### 3. Government Entanglement

Finally, the accommodations here do not require that the government become impermissibly entangled with the accommodation's administration. As in *Tooley*, "[t]he implementation of the substituted charity accommodation requires a minimal amount of supervision and administrative cost." 648 F.2d at 1246. Ms. Madsen has not demonstrated that the ACT policy requires government involvement that is "sufficiently 'comprehensive, discriminating, and continuing' to draw into question the validity of the accommodation." *Id.* (citing *Lemon,* 403 U.S. 602, 91 S.Ct. 2105).

Ms. Madsen has established none of the three elements of an Establishment Clause violation. "[U]nder governing law, there can be but one reasonable conclusion as to the verdict". ACT's accommodation of both agency fee payers and religious objectors does not violate the Establishment Clause of the First Amendment to the United States Constitution or the "No Preference" Clause of the California Constitution. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

### C. EQUAL PROTECTION

Ms. Madsen alleges violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution via 42 U.S.C. § 1983. [Compl. ¶ 22.] As with the Establishment Clause claim discussed above, neither side has addressed whether it is proper to bring Plaintiff's claim under § 1983 and instead only discuss the constitutional challenges to the California union security laws (Cal. Gov.Code §§ 3543, 3546) in accordance with which Defendant acted. Because Defendant is entitled to summary judgment on the merits of the Equal Protection claim, the Court has not considered whether § 1983 is the proper procedural vehicle for Plaintiff's claim.

Ms. Madsen alleges that "Defendant ... has declared and demonstrated that a non-

union member employee with a sincere religious objection will not be given the corresponding benefits afforded to a similarly situated employee who only objects to financing the union's political social and ideological goals" and that "Plaintiff has been deprived of benefits available to similarly situated employees solely because of her religious viewpoint." [Compl. ¶¶ 20–21.].

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Green v. City of Tucson,* 340 F.3d 891, 896 (9th Cir.2003) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

■ "The Supreme Court has developed a tripartite structure for evaluating equal protection challenges to legislation." *Id.* "First, where the statute in question substantially burdens fundamental rights, such as the right to vote, or where the statute employs distinctions based on certain suspect classifications, such as race or national origin, strict scrutiny applies and the statute will be upheld only if the state can show that the statute is narrowly drawn to serve a compelling state interest." *Id.* (citing *Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 2337, 156 L.Ed.2d 304 (2003) (racial classifications); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 627–28, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (right to vote)). "Second, where the statute draws distinctions based on certain other suspect classifications, such as gender, an intermediate level of scrutiny applies and the statute will be upheld if the government can demonstrate that the classification 'substantially furthers an important government interest.'" *Id.* (citing

*Kirchberg v. Feenstra,* 450 U.S. 455, 460, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981)). "All other statutes are subject to the third and least exacting type of scrutiny, rational basis review, and will be upheld if they are rationally related to a legitimate governmental purpose." *Id.* (citing *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.")).

Defendant asserts, and Plaintiff does not dispute, that the classifications created by the EERA must be analyzed under the rational basis test. [*See* Def. Reply at 5 14–15.] Ms. Madsen has not shown that the statute violates a fundamental constitutional right. In addition, Ms. Madsen has not argued, nor is there a reason to find, that school district employees who are religious objectors are a suspect class deserving special judicial protection. Therefore, the statute must be upheld if it is "rationally related to a legitimate governmental purpose." *Green,* 340 F.3d at 896; *see also Locke v. Davey,* —— U.S. ——, —— n. 3, 124 S.Ct. 1307, 1313 n. 3, 158 L.Ed.2d 1 (2004), *Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

■ For the reasons set forth in Part IV A, the statute passes rational basis review. In addition, the legitimate state goal of improving personnel management and employer-employee relations within the public school system in California is rationally related to union security laws that facilitate the effective representation of employees. *See* Cal. Gov.Code § 3540, 3543(a). Even if the reduced amount paid by agency fee payers is considered a benefit (contrary to the Court's finding in Part IV.A.), conferring such a benefit is rationally related to discouraging free riders from selecting religious objector status

over agency fee payer status when their views would indicate that they should belong to the latter group.[4] The California EERA passes rational basis review and, therefore, does not violate the Equal Protection Clause. "[U]nder governing law, there can be but one reasonable conclusion as to the verdict" the EERA, in accordance with which ACT acted with regards to Ms. Madsen, does not violate equal protection. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

---

4. Plaintiff argues that the classifications created by the EERA are "arbitrary" and not "reasonable." [Pl. Mot. at 8 12–9–7.] In support of this argument she states that the Supreme Court held in *Johnson v. Robison*, 415 U.S. 361, 374, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), that "by not including [the objector] and his class, the challenged sections of the Act create an arbitrary classification in violation of appellee's right to equal protection of the laws." [Pl. Mot. at 8 23–9.2.] In fact, this quotation reflects the holding of the district court which was *reversed* by the Supreme Court. *See Johnson*, 415 U.S. at 386, 94 S.Ct. 1160. In the future, Plaintiff's Counsel shall take care to present the law accurately.