[No. A122578. First Dist., Div. Three. May 20, 2009.]

THE CALIFORNIA-NEVADA ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH et al., Plaintiffs and Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

**COUNSEL**

Dennis J. Herrera, City Attorney, Kristen A. Jensen, Thomas S. Lakritz and Victoria Wong, Deputy City Attorneys, for Defendants and Appellants.

O'Leary & O'Leary, Timothy F. O'Leary and B. Douglas Robbins for Plaintiff and Respondent, Pacific Polk Properties, LLC.

Signature Law Group and Gordon W. Egan for Plaintiff and Respondent California-Nevada Annual Conference of the United Methodist Church.

**OPINION**

**POLLAK, J.**—The City and County of San Francisco (the city) appeals from a writ of mandate ordering it to set aside a resolution of its board of supervisors (the board) initiating the process of designating The First St. John's United Methodist Church as a landmark pursuant to article 10 of the city's planning code, entitled "Preservation of Historical Architectural and Aesthetic Landmarks." The superior court concluded that the board exceeded

its jurisdiction in adopting the resolution because state law exempts church property from local landmarking regulation. The city contends that the particular property, which the church no longer uses as a place of worship and has agreed to sell for demolition and the construction of condominiums, is not "noncommercial property" to which alone the exemption applies. The city also raises procedural objections, primarily that the challenge to the resolution is premature because no final decision has yet been made to declare the property to be a landmark. We find no merit in these contentions and shall affirm the well-reasoned decision of the superior court.

## BACKGROUND

*The First St. John's United Methodist Church*

The property known as The First St. John's United Methodist Church, located at 1601 Larkin Street in San Francisco (the property), was constructed in 1911. The property is eligible for listing on the National Register of Historical Places and the California Register of Historical Resources. For some 90 years the property was used to conduct religious services. Due to changing demographics and declining membership, the congregation decided that it could no longer afford to maintain the property. In March 2004, the congregation merged with another local United Methodist congregation and transferred ownership of the property to The California-Nevada Annual Conference of the United Methodist Church (the church), a California religious corporation and administrative arm of the United Methodist Church.

When title was transferred, the building was being used only as a daycare and children's preschool facility. Soon thereafter it was determined that the unreinforced masonry building was unsafe for occupancy and needed significant seismic retrofitting, among other repairs. The building was vacated in 2005 and ever since has remained vacant. The church concluded "that because the congregation no longer wanted or needed to occupy the property, along with the fact that the structure was dilapidated, potentially hazardous and in need of significant structural attention, the only rational decision was to demolish the building." According to the church's director of administrative services, "The property has no use within the church's mission except as an important source of revenue to be generated by a sale. The church intends to use the sale proceeds to further its ministry in the city, where it has 14 congregations." In 2004 the church contracted to sell the property to Pacific Polk Properties, LLC (Pacific Polk), for the development of a 27-unit residential condominium project. Appropriate applications were filed with the city's planning and building inspection departments to obtain permission to raze the property and to proceed with construction. A demolition permit has not yet been issued.

*Applicable Government Code Provisions*

■ Government Code[1] section 25373, which applies to counties, provides in subdivision (b) that the board of supervisors "may, by ordinance, provide special conditions or regulations for the protection, enhancement, perpetuation, or use of places, sites, buildings, structures, works of art and other objects having a special character or special historical or aesthetic interest or value." A separate comparable authorization applies to cities.[2]

In 1994, by Assembly Bill No. 133 (1993–1994 Reg. Sess.), the Legislature amended both statutes to allow religiously affiliated organizations to exempt their noncommercial property from new restrictions that otherwise might be imposed by local landmark designation. Subdivision (d) was added to section 25373 and provides: "Subdivision (b) shall not apply to noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur: [¶] (1) The association or corporation objects to the application of the subdivision to its property. [¶] (2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved." (Stats. 1994, ch. 1199, § 1, p. 7272.) A virtually identical provision was added to the section governing cities. (§ 37361, subd. (c); Stats. 1994, ch. 1199, § 2, p. 7273.) In *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693 [102 Cal.Rptr.2d 280, 13 P.3d 1122] (*East Bay*), a closely divided Supreme Court upheld the facial validity of the exemption, rejecting challenges under the First Amendment of the United States Constitution and article I, section 4 of the California Constitution.

*Administrative and Judicial Proceedings*

A draft environmental impact report (DEIR) for the project was published on April 14, 2007, and on May 16, 2007, the local Landmarks Preservation Advisory Board conducted a public information hearing on the DEIR. Five days later, on May 21, 2007, the board's Land Use and Economic Development Committee, over the church's objections, recommended the adoption of

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] Section 37361, subdivision (b) provides that the legislative body of a city "may provide for places, buildings, structures, works of art, and other objects, having a special character or special historical or aesthetic interest or value, special conditions or regulations for their protection, enhancement, perpetuation or use . . . ." San Francisco, of course, is both a city and a county.

resolution No. 308-07 to initiate proceedings to determine whether the property should be designated a local landmark under article 10 of the city's planning code. The resolution recites that the property "is the only extant California example by nationally renowned architect George Washington Kramer and is a valuable example of early twentieth century church architecture that combines elements of the Mission Revival and English Gothic Tudor styles" and resolves: "That the San Francisco Board of Supervisors does hereby initiate the designation of [the property] as a Landmark, and so refers this resolution to the Landmarks Preservation Advisory for review pursuant to Article 10 of the Planning Code and other applicable provisions of law."[3] On June 5, 2007, over the church's renewed objections, the board adopted the resolution. On August 15, the Landmarks Preservation Advisory Board recommended approval of the landmark designation, and on September 20, 2007, the planning commission recommended that the board approve the proposed landmark designation. The board has not yet acted on the recommendation.

On August 10, 2007, after the board had approved the resolution initiating the landmark process, the church and Pacific Polk filed a petition for a writ of mandate seeking to halt the process. The petition names as respondents the city, the board, and the city's departments of planning and building inspection, and requests a writ directing the respondents to "reverse the Resolution, refrain from enforcing the Resolution or in any way subjecting the property to the San Francisco landmark designation process."[4] After denying the city's motion for judgment on the pleadings based on the ground that the matter was not ripe for adjudication because the designation of property as a local landmark is a legislative act which the city had not yet completed, the court ordered the production of the administrative record and, following a hearing, issued a statement of decision and judgment in July 2008. The judgment grants a writ of mandate "commanding [the city] to set aside any decisions, void any resolution, and discontinue any process in the administrative

---

[3] Article 10 provides that upon designation as a landmark the property shall be "subject to the controls and standards set forth in this Article 10." (S.F. Planning Code, § 1004, subd. (c).) Any permit to alter or demolish a property designated as a landmark must first be reviewed for conformity with the requirements of article 10 (§ 1004, subd. (c)) and no landmark property may be altered or demolished without obtaining a "Certificate of Appropriateness" in the manner specified in the article (id., §§ 1005, subd. (e), 1006). "For applications [for a Certificate of Appropriateness] pertaining to landmark sites, the proposed work shall preserve, enhance or restore, and shall not damage or destroy, the exterior architectural features of the landmark . . . ." (Id., § 1006.7, subd. (b).)

[4] The petition also requested that respondents be directed to issue a demolition permit. The trial court granted the city's motion for judgment on the pleadings as to this portion of the petition on the ground that this request was premature because the city had not yet certified the environmental impact report for the project. No cross-appeal has been taken from the refusal to grant this additional relief.

proceedings entitled 'Resolution to Initiate the Designation of First St. John's Methodist Church . . . as a Landmark.' " The city has timely appealed.

## DISCUSSION

■ The linchpin of the city's appeal is its contention that the church building is not "noncommercial property" within the meaning of sections 25373 and 37361 because it is no longer used for a religious purpose but rather for the "profit-making purpose" of sale and development of condominiums. The city emphasizes that the building has not been used for religious services since 2002 and has been vacant since 2005, and that the church acknowledges that the property no longer has a use within its mission except as a source of revenue generated by its sale. Relying largely on a single phrase within a footnote in *East Bay*, the city contends that the statutory exemption applies only if the property is currently being used for a religious purpose.[5] However, the opinion in *East Bay*, as well as the text of the statute and its legislative history, clearly refute this notion and support the trial court's observation that the "whole point" of the exemption "is to allow religious institutions to sell their dilapidated churches for a profit." As the trial court also pointed out, "the only reason the property is vacant is because it is too unsafe to be used as a church—or for any other purpose. . . . [¶] . . . [T]he only reason the property stopped being a working church was because the property was too unsafe to be used for *any* purpose, commercial or noncommercial. . . . A non-functional church structure, owned by a nonprofit, does not become commercial by virtue of its inactivity."

■ The *East Bay* opinion makes unmistakably clear that the statute permits a religiously affiliated nonprofit property owner "to exempt its property from a landmark preservation law if the owner determines in a public forum that application of the law will cause substantial hardship that is

---

[5] In disagreeing with the interpretation that the majority in *East Bay* attributes to the dissent, that "noncommercial" refers to all forms of real property that are not zoned commercial, the majority states in footnote 6 of its opinion, "In context, it seems clear, however, that [by 'noncommercial'] the Legislature had in mind property whose use is related to the religious entity's fulfillment of the owner's religious mission but is not used for profitmaking purposes. It is true that this could include rental property as some religious entities provide housing for teachers, nurses, students, and other personnel of their affiliated noncommercial operations. It is true also that noncommercial property could include a warehouse—one used to store food or clothing for charitable distribution. It might include a gymnasium, school, hospital, senior citizens home, or agricultural property used to provide rehabilitative employment and food *used for religious and charitable purposes*. The descriptive term used by the Legislature is appropriate to all of these uses." (*East Bay, supra*, 24 Cal.4th at p. 715, fn. 6, italics added as shown in city's opening brief.) In response to the concern expressed in the dissent that the exemption on its face is overbroad, the footnote goes on to say that in the case before it the exemption was not claimed "for any reason other than enabling the religious entity to use the property to better fulfill its religious mission." (*Ibid.*)

likely *to deny the owner economic return on the property*, or deprive the owner of reasonable or appropriate use of its property in furthering the owner's religious mission." (*East Bay, supra*, 24 Cal.4th at p. 709, italics added.) The language of the opinion follows the explicit text of the statute. (§ 25373, subd. (d)(2).) The majority opinion goes on to point out that "the restrictions a historic preservation ordinance imposes on the landmark property . . . including limitation of the right to alter or demolish a designated landmark and responsibility to maintain the structure without access to governmental disaster or other assistance, may impose significant financial burdens on the owner of the property. Any significant financial burden, or simply the inability *to demolish or alter a structure that is no longer suited to the needs of the owner*, could affect the ability of many owners to carry out their religious missions." (*East Bay, supra*, at p. 713, italics added.)

Both the Legislature and the Supreme Court were speaking of, and including within the definition of noncommercial property to which the exemption applies, property that is no longer used or capable of being used for a religious purpose but which may be sold and demolished for a profit. This understanding is made clear by the legislative history to which both the majority and dissenting opinions in *East Bay* refer. The exemption was inserted in the landmark statute to permit the Archdiocese of San Francisco, "facing millions of dollars in seismic retrofitting costs as well as declining attendance in some parish churches," to close and demolish potentially nine of those parish churches. (*East Bay, supra*, 24 Cal.4th at p. 741 (dis. opn. of Werdegar, J.); see *id.* at pp. 710–711, fn. 5 (maj. opn.).) A letter from then Speaker of the Assembly Willie Lewis Brown, Jr., who authored Assembly Bill No. 133 (1993–1994 Reg. Sess.), referred to the plight of religious congregations "faced with very high seismic retrofit costs for older buildings that had been or were subject to landmark designation but could not qualify for assistance from the Federal Emergency Management Agency (FEMA)." (*East Bay, supra*, at p. 710, fn. 5.) The Speaker pointed specifically to "the Korean United Methodist church building [in San Francisco] that the congregation had outgrown and had decided to sell," the offer to purchase which had been withdrawn when the board of supervisors voted to designate the building as a landmark. (*Ibid.*)

The dissenting justices in *East Bay*, who disagreed over the constitutionality of the exemption for property owned by religiously affiliated entities, did not disagree about the scope of the statutes. Their opinions leave no doubt that the exemption provisions apply to property no longer (if ever) used by a religiously affiliated owner for a religious purpose and currently being held for sale and demolition. According to the dissenting opinion of Justice Mosk, "Under the broad provisions of the statute, a church or other religious

organization may exempt itself from landmark regulations for purely economic reasons—including to modify the site solely for financial advantage . . . . [¶] . . . [¶] . . . Thus, a church or other sectarian entity can, if it chooses, destroy a historic building for the purpose of erecting an office building simply for financial advantage." (*East Bay, supra*, 24 Cal.4th at pp. 725–726 (dis. opn. of Mosk, J.).) The dissenting opinion of Justice Werdegar pointed out that "the statutes permit a religious group *to exempt itself*, without any actual showing of need, any assurance that the exempted property is or will remain in religious use, or any governmental review of the self-declared hardship exemption." (*Id.* at p. 728 (dis. opn. of Werdegar, J.).) "Those determinations, moreover, need not even include a claim that the landmark regulation will impede the organization's religious practice; instead, the organization may simply find its *economic* use of the property will be impaired." (*Id.* at p. 730 (dis. opn. of Werdegar, J.).) Justice Werdegar went on to observe, quite critically, that "noncommercial property" as used in the statute "would thus appear to include property used for residential (including multiple-unit rentals), industrial, and agricultural purposes. Moreover, while the property must be owned by a religiously affiliated entity, nothing in the statutes requires that it be in use by the organization; nor do the statutes exclude property leased to others. The exemption could therefore be applied *to property owned by a church but leased to a nonreligious individual or corporation for industrial or residential use.* [¶] Whether or not the property is being used for worship or other religious practices at the time of the self-declared exemption, nothing in the statutes requires that it be so used after exemption, or even that it remain in the religious entity's ownership." (*Id.* at p. 740 (dis. opn. of Werdegar, J.).) "[T]he amendments' design and effect were to award religious organizations the unique ability to manipulate their property holdings without regard for landmark regulations, by altering, demolishing, and selling properties, if they choose, for maximum economic benefit and without the incidental cost and delay attendant on obtaining special permits." (*Id.* at pp. 742–743 (dis. opn. of Werdegar, J.).)

Thus, the city's principal contention that the statutory exemption is inapplicable because the property is not currently being used as a church or for any other religious purpose quite clearly must be rejected. The trial court found and the record contains no basis to question that the church is a religiously affiliated entity that is not organized for private profit, that the church has objected to application of the city's landmark ordinance to the property, which it owns, and that by its explicit objections at public meetings the church has determined in a public forum that it will suffer substantial hardship likely to deprive it of economic return on its property if the ordinance is applied to the property. Therefore, sections 25373, subdivision (d) and 37361, subdivision (c) remove from the city the authorization to apply its landmark ordinance to the church property.

With a proper understanding of the scope of the statutory exemption, the city's procedural arguments are readily seen to lack merit. The city argues that imposing a landmark designation upon a property is a legislative rather than a quasi-adjudicatory act because the designation "merely imposes procedural requirements on designated parcels or districts, and does not dictate how any specific project may or may not be carried out"; that under the city's charter all legislative acts must be accomplished by ordinance; that neither the board of supervisors nor the mayor has yet approved designation of the church property as a landmark; and that the court may not enjoin a municipality from enacting an ordinance. (Civ. Code, § 3423, subd. (g); Code Civ. Proc., § 526, subd. (b)(7); *Sladovich v. County of Fresno* (1958) 158 Cal.App.2d 230, 242 [322 P.2d 565].) The city contends that only after the church property is designated as a landmark, should that occur, may the court intervene to prevent the imposition of any improper restrictions on the use of its property resulting from that designation. At this point the city has taken no final action, it asserts, that is ripe for judicial review.

█ In its reply brief, the city amplifies its contention with an assertion that discloses the fundamental error in its position. "The language of sections 25373 and 37361," the city asserts, "indicate[s] that the legislature only intended to allow religious associations to exempt their noncommercial property from restrictions applicable to landmarked properties, not from a governmental process that identifies and designates landmarks." However, as the Supreme Court held in *East Bay*, the exemption provisions "prohibit application of any local landmark preservation law to property owned by a religious entity that satisfies the statutory criteria through which the owner may exempt its noncommercial property." (*East Bay*, *supra*, 24 Cal.4th at p. 702.) By adopting resolution No. 308-07, the board of supervisors took final action to initiate the process of designating the church property as a landmark. As a result, the provisions of sections 1004.2 and 1004.3 of the city's planning code have been applied to obtain a review and report on the proposed designation from the Landmarks Preservation Advisory Board and to conduct a hearing on the proposal before the planning commission, necessary steps in the city's landmark designation process. While the board of supervisors may never finalize the designation of the property as a landmark, the statute prohibits application of all of the provisions of the historical preservation ordinance to property that the church has taken the prescribed steps to exempt from the ordinance. Since the church has taken those steps and established its right to an exemption, the conduct of any proceedings under the city's ordinance directed towards landmark designation of the property exceeds the authority conferred by sections 25373 and 37361. Simply as a matter of common sense, there is no point in pursuing landmark

designation if the city is prohibited from imposing any restrictions on the use or demolition of the property that otherwise might be imposed as the result of such a designation.

■ If an agency is proceeding in a matter beyond its jurisdiction, judicial intervention may be obtained even though the agency has not yet reached a final decision and the affected party therefore has not yet exhausted its administrative remedies. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1081–1082 [29 Cal.Rptr.3d 234, 112 P.3d 623] (*Coachella Valley*).) Relief may be obtained in such a case even if the unauthorized acts are considered legislative in nature. (See *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 415–417 [711 Cal.Rptr.3d 522] (*Security National Guaranty*).)[6] "In deciding whether to entertain a claim that an agency lacks jurisdiction before the agency proceedings have run their course, a court considers three factors: the injury or burden that exhaustion will impose, the strength of the legal argument that the agency lacks jurisdiction, and the extent to which administrative expertise may aid in resolving the jurisdictional issue." (*Coachella Valley, supra,* 35 Cal.4th at p. 1082; see *Security National Guaranty, supra,* 159 Cal.App.4th at pp. 416–417.)

■ The latter two of these three factors unquestionably militate in favor of immediate review in this case. The preceding discussion establishes that the church's contention that the city lacks jurisdiction to subject its property to the local landmarking ordinance is not only strong, but necessarily correct. All agencies of state government, including counties and charter cities, are of course bound by the general laws of the state. (Cal. Const., art. XI, §§ 1, 5, subd. (a); see, e.g., *San Francisco v. Canavan* (1872) 42 Cal. 541, 557–559; *Ferrini v. City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 246 [197 Cal.Rptr. 694]; *City and County of San Francisco v. Padilla* (1972) 23 Cal.App.3d 388, 400 [100 Cal.Rptr. 223]; see generally 2 McQuillan, The Law of Municipal Corporations (3d ed. 2005) §§ 4:5, 4:6, pp. 19–20, 23–26.) And the petition presents an issue that is solely one of law that the court determines independently, so that "this issue is not one that would benefit from application of administrative expertise." (*Security National Guaranty, supra,* 159 Cal.App.4th at p. 417.)

---

[6] While quasi-legislative acts may not be reviewed by way of administrative mandamus under Code of Civil Procedure section 1094.5, they may be reviewed by traditional mandamus under Code of Civil Procedure section 1085, as well as by an action for declaratory relief. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 168–169 [188 Cal.Rptr. 104, 655 P.2d 306].) Thus, even accepting the city's characterization of its landmarking process as legislative action, it is not significant that there is no final decision permitting relief under the administrative mandamus procedure, as the city also argues.

The parties disagree as to whether the church will be prejudiced by deferring determination of the city's ability to impose landmark restrictions on the property until a final decision is made designating the property as a local landmark. Section 1006.6, subdivision (b) of the city's planning code provides that if an application for a "Certificate of Appropriateness" under the code "proposes removal or demolition of a structure on a designated landmark site," the planning commission may suspend action on the application for up to 180 days or upon board resolution an additional 180 days. Section 1014, subdivision (a) of the city's planning code provides that "[n]o application for a permit to construct, alter or demolish any structure or other feature on a landmark site . . . filed subsequent to the day that an application has been filed or a resolution adopted to initiate designation of the said landmark site . . . shall be approved by the Department [of City Planning] while proceedings are pending on such designation; provided however, that after 180 days have elapsed from the date of initiation of said designation, if final action on such designation has not been completed, the permit application may be approved." The church has pointed to these provisions to argue that the very initiation of the landmarking process delays issuance of the permits necessary for it to proceed with the project. The city responds that neither section has had any application in this case: section 1006.6, subdivision (b) of the city's planning code applies only after the property has been designated as a landmark, and section 1014, subdivision (a) of the code does not apply because the church filed its permit applications before, rather than after, adoption of the resolution initiating the landmark process. The reason that not even a demolition permit has yet been issued, despite the filing of the application for that permit in December 2004, the city points out, is that a final environmental impact report for the project has not yet been certified. The church argues that since the code contains no time limit within which the board of supervisors must act on the proposed landmark designation, the city may keep the project "in landmarking limbo forever." Referring to the incident concerning the Korean United Methodist church that was brought to the Legislature's attention in support of Assembly Bill No. 133 (1993–1994 Reg. Sess.) and cited in the *East Bay* decision (see p. 1566, *ante*), in which the purchaser withdrew its offer to buy the church building after the board of supervisors voted to designate it as a landmark, the church suggests that the extended pendency of the landmark process here may jeopardize its agreement to sell the property to Pacific Polk.

On balance, the record fails to establish that the initiation of the landmarking process has thus far caused delay in the completion of the permit process for the project, and future delay is at most speculative. However, since continuing with the landmarking process cannot possibly lead to valid restrictions on the church's ability to demolish the property, the absence of demonstrable hardship to the church is offset by the absence of any potential

disadvantage to the city from an immediate resolution of the controversy. Moreover, the potential for delay remains. Even if no restrictions eventually result, participation in the process requires time, effort and expense, and the process necessarily generates uncertainty that may discourage the parties from going forward with the project. Considering all three factors relevant to the appropriateness of judicial intervention prior to completion of the land-marking process, we think it clear that now is the time to abort further proceedings that unquestionably are beyond the city's jurisdiction.

The city's position is no stronger when its argument is viewed in terms of ripeness. The city relies heavily upon *Pacific Legal Foundation v. California Coastal Com., supra,* 33 Cal.3d at page 171, in which the Supreme Court held that a facial challenge to public access guidelines adopted by the California Coastal Commission was not ripe for adjudication, embracing the test adopted in federal courts requiring the court " '*to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.*' " The court found the challenge to the public access guidelines not fit for a judicial decision because, as the trial court had held, "it could not decide the validity of the guidelines except when faced with a specific exaction." (*Id.* at p. 170.) The court observed, "the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Ibid.*) Moreover, the adoption of guidelines, without the imposition of particular dedication conditions pursuant to those guidelines, did not threaten property owners with immediate hardship. (*Id.* at pp. 172–173.) The situation is very different here. There is no lack of concreteness to the issue of whether the city may apply its ordinance to the church property. The question does not turn on the validity of particular restrictions to the use or demolition of the property that may result from landmark designation. The church's position, which we have determined to be correct, is that the city has no jurisdiction to subject the church property to the ordinance regardless of the particular restrictions that may result, or whether any restrictions result, from application of the ordinance. Hence, the matter is ripe for adjudication, whether or not deferring a decision would result in any hardship.

Finally, we need not be concerned with the city's last argument, that Pacific Polk has no standing to litigate the application of sections 25373 and 37361 to the church property which it does not yet own. Pacific Polk argues that it is nonetheless interested in the matter by virtue of its agreement with the church to purchase the subject property. We see no need to determine whether this financial interest is sufficient to confer standing in this particular litigation, since there is no question about the standing of the church and the outcome of the litigation will be no different whether or not Pacific Polk is

recognized as a copetitioner. Either way, the trial court properly held that the city has no jurisdiction to apply its landmark ordinance to the church property, and that the adoption of resolution No. 308-07 was an act for which it had no jurisdiction and is properly set aside by a writ of mandate.[7]

### DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Siggins, J., concurred.

---

[7] We deem the record to include many of the documents included in the city's requests for judicial notice and the remainder of the documents to be unnecessary to resolve the issues raised by the appeal. We therefore deny the city's request and the respondents' counterrequest.