[No. B212733. Second Dist., Div. Three. Nov. 22, 2010.]

OR KHAIM HASHALOM, Plaintiff and Appellant, v.
CITY OF SANTA MONICA, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 3. and 4. of the Discussion.

**COUNSEL**

Law Offices of Rosario Perry, Rosario Perry and Andi K. Terada for Plaintiff and Appellant.

Marsha Jones Moutrie, City Attorney, Joseph Lawrence, Assistant City Attorney, and Alan Seltzer, Chief Deputy City Attorney, for Defendant and Respondent.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

In this appeal, we are asked to determine whether real property in Santa Monica (the City) owned by plaintiff Or Khaim Hashalom (OKH) qualifies for the statutory exemption from historic preservation provided by Government Code section 37361, subdivision (c). That statute creates an exemption for noncommercial property owned by a religious organization. We hold that OKH's property does not qualify for this exemption because it

has always been a commercial enterprise, both when OKH purchased it and at the time OKH sought the exemption. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The property*

Known as the Teriton Apartments (the Teriton),[1] and constructed in 1949–1950, the property consists of a 28-unit, rent-controlled garden-style apartment complex in a single two- and three-story structure, arranged in a pinwheel or serpentine plan around landscaped courtyards. The Teriton was identified and assessed numerous times in the past under the City's survey process as part of the City's historic resources inventory of potential historic resources. Sellers are required to disclose to potential buyers whenever property for sale is listed on this inventory.

In November 2005, Teriton Investors, LLC, executed a deed granting the property to OKH. Simultaneously, an application to demolish the building was filed. This application triggered review by the City's Landmarks Commission (the Commission) because of the Teriton's age. At the November 14, 2005 hearing, a representative of OKH testified but made no mention of any religious institution or purpose. The Commission voted to continue the action at the next meeting to gather additional information. However, OKH's representatives soon withdrew the demolition application and so the Teriton was not considered at the next monthly Commission meeting.

### 2. *OKH incorporates as a religious organization.*

Two months later, on January 26, 2006, Rosario Perry executed OKH's articles incorporating it as a not-for-profit religious corporation. The documents were filed with the Secretary of State on March 6, 2006.

In May 2006, OKH announced plans to demolish the Teriton and construct a new building. On July 10, 2006, the Commission requested preparation of a preliminary historic assessment of the property.

OKH held a public forum in August 2006 where it explained that it planned to use the property to house Jewish refugees from Iran and Iraq. For this plan, it had "an economic model that has not been defined—that hasn't been finalized. We are looking for subsidized rent. We are looking for donations . . . [and are also] considering the possibility of a few units being

---

[1] The first owner of the building, Edgar M. Hillman, named the building after his twin daughters, Teri and Toni.

condominiums and sold." At that time, OKH was not listed in directory information and its spokesperson declined to answer whether OKH was operating as a synagogue.

On August 14, 2006, OKH submitted a "Notice of Exemption of Property from City Landmarks Ordinance Pursuant to Government Code section 37361."

OKH has never used the Teriton for any purpose other than as a commercial rental property, either before invoking the exception under Government Code section 37361, subdivision (c), or afterwards.

### 3. *The Commission's proceedings*

The Commission applied for landmark designation in September 2006, and requested a city landmark assessment report from consultant PCR Services Corporation (PCR). The City's Municipal Code (SMMC) section 9.36.100, subdivision (a) lists the criteria necessary for property to qualify for landmark designation. As relevant here, property will qualify if it (1) "exemplifies, symbolizes, or manifests elements of the cultural, social, economic, political or architectural history of the City" or (2) "has aesthetic or artistic interest or value, or other noteworthy interest or value."

Based on PCR's report, the Commission's staff initially recommended against designation. The staff explained that the Teriton did not appear to be particularly noteworthy, unique or rare, and did not meet the designation criteria to be eligible for landmark designation.

On November 13, 2006, the Commission held a public hearing. Numerous witnesses from the public, including residents of the Teriton, neighbors, preservationists, and architects, testified and submitted articles and pictures into the Commission's record about the characteristics of the property qualifying it for landmark status. The testimony and evidence also identified errors in the PCR report and the report of OKH's consultant, EDAW, Inc.

At the close of the hearing, the Commission unanimously designated the property's structure as a landmark and the real property as a landmark parcel under landmark designation criteria (1), (2), (4), (5), and (6) of SMMC section 9.36.100, subdivision (a).

On November 16, 2006, OKH filed with the City a presubmittal review application to construct 22 condominiums, including "2 moderate income + synagogue" on the property.

### 4. *The Santa Monica City Council's proceedings*

OKH appealed from the Commission's decision to the city council. By the time the matter was placed before the city council in June 2007, the staff had reviewed the entire record and recommended to the city council that the designation be approved based on criteria (1) and (2) of SMMC section 9.36.100, subdivision (a). In the city council's record are articles, pictures, and testimony about the Teriton, its famous inhabitants, and its historical and architectural characteristics that exemplify postwar modern vernacular architecture with elements of the modern international style; the influence of Gropius and Le Corbusier's Quartiers Modernes; the building's excellent integrity, well-preserved condition, and its unique serpentine or pinwheel footprint. After the hearing, the city council voted unanimously to designate the Teriton as a landmark and the real property as a landmark parcel based on its findings under criteria (1) and (2).

### 5. *The proceedings below*

OKH brought the instant petition for writ of mandate in the trial court seeking an order compelling the City to set aside its designation and reverse the city council's decision. The trial court denied the writ petition. In its statement of decision, the court explained, inter alia, that OKH was not entitled to the exemption from historic preservation designation under Government Code section 37361, subdivision (c) because the property was not "noncommercial" when OKH purported to exempt it. OKH filed its timely notice of appeal.

## DISCUSSION

### 1. *Standard of review*

Code of Civil Procedure section 1094.5, the state's administrative mandamus provision, sets forth the procedure for judicial review of adjudicatory decisions rendered by administrative agencies. " 'The court's review of the administrative decision extends "to the questions whether the [Commission] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." [Citation.] The courts review the findings and decision of the [Commission] under a substantial evidence standard, as here, when no fundamental vested right is implicated. [Citation.] "When the substantial evidence test applies, the trial court exercises an essentially appellate function in determining whether the administrative

record is free from legal error." ' " (*NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 335 [70 Cal.Rptr.2d 237].)

Our scope of review on appeal is identical to that of the trial court. (*NBS Imaging Systems, Inc. v. State Bd. of Control, supra,* 60 Cal.App.4th at p. 335.) However, we are not bound by the trial court's findings to the extent they constitute conclusions of law. (*Family Planning Associates Medical Group, Inc. v. Belshé* (1998) 62 Cal.App.4th 999, 1004 [73 Cal.Rptr.2d 221].)

### 2. *The Teriton does not qualify for the exemption from landmark designation under Government Code section 37361, subdivision (c).*

■ Government Code section 37361 grants authority to cities to acquire historic landmarks for the purpose of preservation. The statute also authorizes cities to institute special conditions or regulations to protect, enhance, perpetuate, or use places, buildings, structures, works of art, and other objects that have special character or special historical or aesthetic interest or value. (Gov. Code, § 37361, subd. (b).)

■ Subdivision (c) of Government Code section 37361 allows religiously affiliated organizations to declare their properties exempt from historic preservation laws. Subdivision (c) grants the exemption for *"noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit*, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur: [¶] (1) The association or corporation objects to the application of the subdivision to its property. [¶] (2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved." (Gov. Code, § 37361, subd. (c), italics added.)

On appeal, OKH contends that the property is noncommercial and so OKH has met all of the requirements of Government Code section 37361, subdivision (c) qualifying it for the exemption, with the result that the City failed to follow the law when it designated the Teriton as a landmark. The trial court disagreed, ruling that to qualify for the exemption, property must be noncommercial when the religious organization purports to exempt it and before the application for exemption is approved.

We agree with the trial court and hold that the Teriton does not qualify for the exemption of Government Code section 37361, subdivision (c) because it

was not "noncommercial property owned by any association or corporation that is religiously affiliated" at the time OKH sought to exempt it and at the time the Commission designated it a landmark.

■ The Supreme Court in *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693 [102 Cal.Rptr.2d 280, 13 P.3d 1122] (*East Bay*), upheld by a narrow majority the facial validity of the exemption in Government Code section 37361, subdivision (c), rejecting challenges under the First Amendment of the United States Constitution and article I, section 4 of the California Constitution. The court dispelled the contention that the exemption violates the establishment clause by providing economic advantages to religious groups at the expense of neighbors. *East Bay* explained that a law is not unconstitutional merely because it allows churches to advance religion. The exemption's "only impact," the Supreme Court explained, "is that the owner may *continue* to use the property as it sees fit . . . *to further its religious mission* unrestricted by the historic preservation law" and that the statute "[p]ermit[s] a religious body to use its noncommercial property *in the manner it did before a restrictive law was imposed* . . . ." (24 Cal.4th at p. 714, italics added.)

■ As for what constitutes "noncommercial," the *East Bay* majority rejected the dissent's expansive construction stating, "In context, it seems clear . . . that the Legislature had in mind property whose *use is related to the religious entity's fulfillment* of the owner's religious mission but *is not used for profitmaking purposes*. It is true that this could include rental property as some religious entities provide housing for teachers, nurses, students, and other personnel of their affiliated noncommercial operations. It is true also that noncommercial property could include a warehouse—one used to store food or clothing for charitable distribution. It might include a gymnasium, school, hospital, senior citizens home, or agricultural property used to provide rehabilitative employment and food used for religious and charitable purposes. The descriptive term used by the Legislature is appropriate to all of these uses." (*East Bay, supra*, 24 Cal.4th at p. 715, fn. 6, italics added.) The obvious implication of the Supreme Court majority's description in *East Bay*, is that to be "noncommercial" under Government Code section 37361, subdivision (c) exemption, the property's use must be related to the religious-entity owner's fulfillment of its religious mission but not for profit making. More important, in describing the exemption as enabling a religious entity to "further its religious mission," and allowing a religious body to use its property "in the manner it did before a restrictive law was imposed" (*East Bay, supra*, at p. 714), the majority indicates that to qualify for the section 37361, subdivision (c) exemption, the property must at a minimum be noncommercial *at the time the entity seeks an exclusion from historic preservation.*

This question of what constitutes noncommercial property was again addressed in *California-Nevada Annual Conference etc. v. City and County of San Francisco* (2009) 173 Cal.App.4th 1559 [94 Cal.Rptr.3d 64] (*United Methodist*). For 90 years, the building there was used to conduct religious services. Its ownership was then transferred to the California-Nevada Annual Conference of the United Methodist Church and was being used as a daycare and children's preschool. Soon thereafter, the building was deemed to require significant seismic retrofitting and had been vacant since 2005. Deciding to demolish the building because the only use the property had within the church's mission was to generate proceeds from its sale to further its ministry, the church contracted to sell it to a buyer for commercial development. (*Id.* at p. 1562.) After San Francisco initiated the process of designating the building as a landmark, the church obtained a writ of mandate ordering San Francisco to set aside the resolution. San Francisco appealed.

The question in *United Methodist* was whether the church building was "noncommercial property" within the meaning of Government Code section 37361, subdivision (c).[2] San Francisco argued, where the property was vacant, it was not "*currently* being used for a religious purpose" and so it was not noncommercial. (*United Methodist, supra*, 173 Cal.App.4th at p. 1565, italics added, fn. omitted.) The appellate court disagreed, noting *East Bay* had refuted that idea. (*Ibid.*) Concluding that the property fell within the statutory exemption, *United Methodist* recognized that "[b]oth the Legislature and the Supreme Court [in *East Bay*] were speaking of, and including within the definition of noncommercial property to which the exemption applies, property that is *no longer used or capable of being used for a religious purpose* but which may be sold and demolished for a profit." (*Id.* at p. 1566, italics added.) Referring to the legislative history, *United Methodist* explained that "the exemption was inserted in the landmark statute to permit the Archdiocese of San Francisco, 'facing millions of dollars in seismic retrofitting costs as well as declining attendance in some parish *churches*,' to close and demolish potentially nine of those parish *churches*. [Citations.] A letter from then Speaker of the Assembly Willie Lewis Brown, Jr., who authored Assembly Bill No. 133 (1993–1994 Reg. Sess.), referred to the plight of *religious congregations* 'faced with very high seismic retrofit costs for older buildings that had been or were subject to landmark designation but could not qualify for assistance from the Federal Emergency Management Agency (FEMA).' [Citation.] The Speaker pointed specifically to 'the Korean United Methodist *church* building [in San Francisco] that the congregation had outgrown and had decided to sell,' the offer to purchase which had been withdrawn when the board of supervisors voted to designate the building as a

---

[2] Also at issue in *United Methodist* was Government Code section 25373, a companion statute to Government Code section 37361 that applies to counties rather than to cities.

landmark. [Citation.]" (*Ibid.*, italics added, citing *East Bay, supra*, 24 Cal.4th at p. 741 (dis. opn. of Werdegar, J.); *id.* at pp. 710–711, fn. 5 (maj. opn. of Baxter, J.).)

Accordingly, *United Methodist* explained, the " 'whole point' of the exemption 'is to allow religious institutions to sell their dilapidated *churches* for a profit . . .' [and] 'the only reason the property is vacant is because it is too unsafe to be used as a church—or for any other purpose. . . . [¶] . . . [T]he only reason the property stopped being a *working church* was because the property was too unsafe to be used for any purpose, commercial or noncommercial. . . ." (*United Methodist, supra*, 173 Cal.App.4th at p. 1565, italics added & omitted.) The appellate court in *United Methodist* agreed with the trial court in that case that, " 'A non-functional *church structure*, owned by a nonprofit, does not become commercial by virtue of its inactivity.' " (*Ibid.*, italics added.) *United Methodist* involved property that was noncommercial as it had been used by a religious entity for religious purposes for over 90 years and continued its noncommercial use while vacant. All of the noncommercial use occurred before the religious entity sought an exemption from landmark status.

The clear implication of *East Bay* and *United Methodist* and the legislative history on which they rely, is that to qualify for the exemption from historic preservation under Government Code section 37361, subdivision (c), the property must be "noncommercial," i.e., used for the religious institution's mission and not for profit, *before the religious institution seeks to invoke the exemption.*

The Teriton does not fall within the class of property that *East Bay* and *United Methodist* determined qualifies for the exemption under Government Code section 37361, subdivision (c). The Teriton has been a commercial, for-profit apartment building since it was built. The building has never been used for a religious entity's mission and has never been a nonprofit concern. Also, OKH had no religious purpose either at the time it purchased the Teriton, or when it initially sought to demolish the building. Only later did OKH form as a religious corporation and attempt to invoke the section 37361, subdivision (c) exemption. Even so, when OKH invoked the exemption, it was no more than a landlord of a conventional, commercial rent-controlled apartment building having no purpose related to any religious mission. Thus, the Teriton has never had a noncommercial purpose related to a religious entity's mission and OKH has never used the property for any other purpose than as an ongoing for-profit commercial enterprise.

OKH contends that the exemption in Government Code section 37361, subdivision (c) "does not necessitate that the property [be] currently, or

[have] ever been, used by a religiously affiliated owner for a religious purpose." The contention must be rejected. Section 37361, subdivision (c) clearly requires that the property be *noncommercial. East Bay* clearly contemplated that the property's use, at the time the exemption is sought, be "related to the religious entity's fulfillment of the owner's religious mission" and "not used for profitmaking purposes." (*East Bay, supra,* 24 Cal.4th at p. 715, fn. 6.) Both *East Bay* and *United Methodist* implied that the noncommercial use must predate the landmark designation and the exemption application. Section 37361, subdivision (c) cannot be intended, as OKH argues it is, to exempt property that was *never* used for noncommercial or nonprofit purposes and never related to a religious entity's mission until after the landmark designation process commenced. Otherwise, a nonsectarian owner could thwart a designation merely by incorporating as a religious association and declaring an exemption on its commercial property. Or, if OKH were correct, a religious entity could trump the historic preservation scheme by purchasing a landmark and later declaring the exemption so as to demolish the landmark and erect a commercial building for financial advantage. Under either scenario, the exemption would eviscerate the historic preservation statutes.

Furthermore, the portion of *United Methodist* that OKH cites, 173 Cal.App.4th at page 1566, does not actually support OKH's position. *United Methodist* stated that the opinions of *East Bay's dissenting* justices "leave no doubt that the exemption provisions apply to property no longer (if ever) used by a religiously affiliated owner for a religious purpose . . . ." (*United Methodist, supra,* at p. 1566, citing *East Bay, supra,* 24 Cal.4th at pp. 725–743.) We disagree with *United Methodist* to the extent it suggests the exemption applies to property *never* used by a religious organization for a religious purpose. We do not think *East Bay* went that far. Rather, the quoted *East Bay* dissents described the potential abuses of the exemption as written, which exemption they viewed as overbroad. For example, dissenting Justice Mosk stated "Under the broad provisions of the statute, a church or other religious organization may exempt itself from landmark regulations for purely economic reasons—*including to modify the site solely for financial advantage* . . . . [¶] . . . [¶] . . . Thus, a *church or other sectarian* entity can, if it chooses, *destroy a historic building for the purpose of erecting an office building simply for financial advantage.*" (*East Bay, supra,* 24 Cal.4th at pp. 725–726 (dis. opn. of Mosk, J.), italics added.) Justice Werdegar stated that "the statutes permit a religious group to exempt itself, *without . . . any assurance that the exempted property is or will remain in religious use . . . .*" (*Id.* at p. 728 (dis. opn. of Werdegar, J., italics added & omitted).) Continuing, Justice Werdegar stated " '[n]oncommercial property' would thus appear to include property used for residential (including multiple-unit rentals), industrial, and agricultural purposes. Moreover, while the property must be owned by a religiously affiliated entity, *nothing in the statutes requires that it*

*be in use by the organization*; nor do the statutes exclude property leased to others. The exemption could therefore be applied to property owned by a church but leased to a nonreligious individual or corporation for industrial or residential use. [¶] Whether or not the property is being used for worship or other religious practices at the time of the self-declared exemption, nothing in the statutes requires that it be so used after exemption, or even that it remain in the religious entity's ownership." (*Id.* at p. 740 (dis. opn. of Werdegar, J.), italics added.) These dissents were clearly describing the potential for abuse of the exemption, and thus they were not advocating that Government Code section 37361, subdivision (c) should allow for the possibility that the subject property never have a religious or noncommercial use before the exemption is sought. Indeed, as explained, the East Bay majority rejected the dissents' construction of "noncommercial," carefully limiting the reach of section 37361, subdivision (c) to structures whose use is currently related to a religious and nonprofit-making mission.

█ Actually, *East Bay*'s dissenting justices envisioned as abuses the very conduct in which OKH seeks to engage. OKH was not a religious entity when it sought to demolish the Teriton and construct a state-of-the-art condominium complex. Only after realizing that the demolition application would trigger Commission review did OKH withdraw its demolition permit and incorporate as a nonprofit religious entity. Nor did OKH contemplate that the property would be used for a religious purpose after the exemption. Initially, OKH had no specific plans for the property's use—religious or not. It was only after the Commission voted to designate the landmark did OKH file a presubmittal review application to construct 22 condominiums, of which two units would be "moderate income," and there would be a synagogue. Neither *East Bay* nor *United Methodist* supports OKH's position. To paraphrase *United Methodist*, a structure with an ongoing commercial use, never employed for a religious purpose, is not transformed into a noncommercial building merely because the owner incorporates itself as a religious organization during the landmark designation process.

█ For the foregoing reasons, because the Teriton is not, and never has been, noncommercial, OKH has not fulfilled all of the Government Code section 37361, subdivision (c) elements to invoke the exemption. As a result, the City did not exceed its jurisdiction in designating the property a landmark and the trial court properly denied OKH's writ petition.

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 375.

## DISPOSITION

The judgment is affirmed. OKH to bear costs of appeal.

Klein, P. J., and Croskey, J., concurred.